# In The United States Court of Federal Claims

No. 06-668C

(Filed under seal: October 13, 2006)

(Reissued: October 26, 2006)[1]

| | | |
|---|---|---|
| REILLY'S WHOLESALE PRODUCE, | * | |
| | * | Motion for preliminary injunction; |
| Plaintiff, | * | Automatic stay imposed by Competition in |
| | * | Contracting Act of 1984; Override decision |
| v. | * | under 31 U.S.C. § 3553(d)(3)(C); |
| | * | Jurisdiction to review under 28 U.S.C. |
| THE UNITED STATES, | * | § 1491(b); Likelihood of success on the |
| | * | merits; Rationale for override decision |
| Defendant, | * | appears arbitrary and capricious; Other |
| | * | conditions for preliminary injunctive relief |
| FOUR SEASONS PRODUCE, INC., | * | met; Preliminary injunction enjoining |
| | * | performance issued. |
| Defendant-Intervenor. | * | |
| | * | |

**OPINION AND ORDER**

*Michael J. Schaengold*, Patton, Boggs, L.L.P., Washington, DC, for plaintiff.

*Dawn Suzanne Conrad*, United States Department of Justice, Washington, DC, with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

*David P. Metzger*, Holland & Knight, LLP, McLean, VA, for defendant-intervenor.

**ALLEGRA, Judge**:

This contract case is before the court on plaintiff's motion for a preliminary injunction. After careful consideration of the briefs filed by the parties, as well as the oral argument, and for

[1] An unredacted version of this opinion was issued under seal on October 13, 2006. The parties were given an opportunity to propose redactions, but no such proposals were made. Accordingly, the opinion is issued in its original form, with minor corrections.

the reasons discussed below, the court hereby **GRANTS** plaintiff's motion for preliminary injunction.

## I. FACTS[2]

The Defense Commissary Agency (DeCA) operates commissaries for the United States military and is an agency of the Department of Defense (DoD). The Department of Defense Supply Center-Philadelphia (DSCP) is a DoD sub-agency of the Defense Logistics Agency (DLA). Prior to October of 2006, DSCP facilitated the purchase of fresh fruits and vegetables[3] for DeCA military commissaries worldwide. One of the suppliers that it used for this purpose was plaintiff, Reilly's Wholesale Produce, Inc. (RWPI or plaintiff). In late 2005, however, after discussions and research, the DoD announced that DeCA would be responsible for contracting directly with vendors to procure produce for its commissaries. The transition was to take place over a 9-month period, with a target completion date of October 1, 2006. The transition plan involves downsizing DSCP's field buying operation and dividing parts of the world into six service areas (the continental United States, Hawaii, Alaska, Puerto Rico, Iceland, and Cuba). Contracts have been awarded for five of these areas,

On March 20, 2006, DeCA issued a Solicitation (HDEC02-06-R-0005) for the procurement of fresh produce for Area 3 (the Northeast). On August 22, 2006, DeCA awarded Four Seasons Produce Inc. (Four Seasons) the contract (HDEC02-06-D-0013) for Area 3, Groups 1 and 2. That contract is for a base term of two years, beginning on September 22, 2006, with two twelve-month option periods that may be exercised by the contracting officer. On August 25, 2006, plaintiff was notified of this award, via email. On September 1, 2006, one of the offerors that did not receive this award, Philadelphia Produce Market Wholesalers (Philadelphia Produce), filed a protest of the contract with the Government Accountability Office (GAO). It challenged the award to Four Seasons based on an alleged conflict of interest derived from the latter firm's use of a consultant who is a former high-level DeCA employee. On September 5, 2006, RWPI filed its own protest with the GAO, alleging essentially the same conflict of interest claim and arguing, in addition, that: (i) the agency's evaluation of plaintiff's proposal was flawed; and (ii) the agency's best value analysis was based on an unreasonable evaluation of plaintiff's technical proposal. Pursuant to the automatic stay provisions of 31 U.S.C. § 3553(d), on September 5, 2006, DeCA notified Four Seasons that the contract was suspended and that it was required to cease performance pursuant to FAR § 33.104(c)(1). Although performance of the contract was thereby stayed, DeCA participated in a training session with Four Seasons that was scheduled for September 6-7, 2006.

---

[2] Owing to the urgent need of the parties for a ruling in this matter, the court's recitation of the facts and law is necessarily brief.

[3] Various documents in the record refer to this commodity as "FF&V;" the court generally will refer to the same commodity as "produce."

On September 6, 2006, DeCA contacted the top two offerors on the original contract, Four Seasons and Military Produce Group (MPG), to assess their interest in performing an interim contract, under which fresh produce would be delivered for approximately 120 days. DeCA did not contact any of the other original offerors, including plaintiff. On September 6, 2006, Four Seasons responded that it was interested in the interim contract, and would perform under the same terms as its initial offer. That same day, MPG expressed its interest in the interim contract, but did not indicate whether it would be willing to perform on the same terms as its initial offer.

On September 7, 2006, DeCA sent a letter to GAO indicating that it did not anticipate overriding the automatic stay, but was exploring the option of awarding an interim contract. The letter recites that "DeCA has contacted DSC-P to determine whether they, in light of their current status, would be able to continue to support DeCA at the required levels of service. DSCP responded that because they are downsizing they cannot adequately support DeCA's requirement beyond October 1, 2006." A memorandum authored by the Chief of the Resale Contracting Division of DeCA, also dated September 7, 2006, summarizes a conversation with DSCP and indicates that "after considering the status of their agency's transition to their new operational business model, and considering the number of their field buying personnel that are already listed on Priority Placement listings, and considering the number of e-mails that they're currently receiving each day expressing concerns about the drop-off in the level of services we're receiving," DSCP felt it could not support DeCA after October 1, 2006. This memorandum further indicates that DeCA would continue to move toward establishing an interim contract and specifically refers to Four Seasons as being the provider. On September 11, 2006, MPG reiterated that it would be willing to perform the interim contract, this time indicating that it was prepared to do so on the same terms and conditions as its initial offer.

On September 11, 2006, the Head of the Contracting Activity at DeCA signed a Justification Review Document approving the use of other than full competition for the award of the interim contract, invoking, for this purpose, his authority under 10 U.S.C. § 2304(c)(2) and FAR § 6.302-2 (Unusual and Compelling Urgency). This document states that providing fresh produce is vital to the agency and that there is "no alternative" to provide these necessities "but to contract for the products/services via an interim contract for four months (120 calendar days)." Noting time constraints on developing other options, the document justified the award of the interim contract to Four Seasons stating, "[g]iven the urgency of the requirement, and the lack of sufficient time to conduct another solicitation in time to meet the drop-off of current service support from DSC-P, DeCA will award this interim contract to [Four Seasons] for the same services as were advertised in the original solicitation." On September 12, 2006, DeCA awarded the interim contract to Four Seasons. This contract is for a period of 120 days, beginning on September 12, 2006, with two 30 day options to be used at DeCA's discretion.

On September 13, 2006, RWPI, which was not aware of the interim contract award, notified DeCA that it and other suppliers were ready to provide fresh produce under their preexisting contracts with DSCP. On September 14, 2006, DeCA notified GAO and RWPI that

it had awarded an interim contract (HDEC02-06-D-0017) to Four Seasons two days prior. In that letter, DeCA indicated that it could not justify an override of the automatic stay when the option to award an interim contract existed, asserting:

> A decision to override the automatic CICA stay provisions is a very serious matter and requires a determination that the interests of the United States, not just the agency involved, will be significantly affected. The Agency did not believe it could justify that determination since it had another alternative, which is to award an interim contract.

RWPI was never contacted by DeCA to inquire into its ability to continue its performance under its preexisting relationship with DSCP.

On September 19, 2006, RWPI filed a protest to the award of the interim contract, alleging that DeCA had failed to comply with full and open competition requirements, including failing to request offers from as many sources as practicable and to review and assess sufficiently alternatives to the award of an interim contract to Four Seasons. The performance of the interim contract was then stayed pursuant to the CICA automatic stay.

On September 20, 2006, DeCA issued its Determination and Findings overriding the stay of the interim contract. The determination cites "[u]rgent and compelling circumstances that significantly affect the interests of the United States" as the basis for the override decision. As evidence of these circumstances, the determination indicates that "[t]he loss of this product to our stores would negatively impact our patrons if they are unable to obtain this essential category of products, but DECA as an agency would also suffer because the surcharge generated from those lost sales – estimated at over $3M per month – would not be available to the agency to maintain its infrastructure." The determination also notes that DeCA could not extend performance by an incumbent contractor because no such contractor existed. It further indicates that DSCP had expressed an "inability" to continue its coverage beyond September 24, 2006.

On September 25, 2006, plaintiff filed a complaint in this court seeking a temporary restraining order, preliminary and permanent injunctions, and declaratory relief alleging that the override of the automatic stay on the interim contract is arbitrary, capricious, an abuse of discretion and a violation of CICA. Four Seasons moved to intervene as a defendant on September 27, 2006, and its motion was immediately granted. Defendant and defendant-intervenor filed their responses on October 3, 2006. Plaintiff filed its reply on October 6, 2006.[4]

---

[4] The parties have filed a variety of motions to supplement the administrative record in this case and have also attached to their briefs affidavits and declarations that, at least in part, should have been the subject of motions to supplement. *See Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 33-34 (2006) (holding that certain materials attached to briefs were not properly before the court). By separate orders, the court will grant these motions, subject to reconsideration at a later point. It has considered all the evidence submitted, including that attached to the briefs, in resolving the instant motion.

Oral argument was held on October 10, 2006.[5] At the argument, counsel for defendant admitted that were this court to reinstate the stay and enjoin preliminarily the performance of the interim contract, defendant, with some delay, would be able to obtain fresh produce for the affected commissaries.

Late afternoon, on October 12, 2006, the GAO dismissed plaintiff's protest of the original award to Four Seasons, finding, *inter alia*, that RWPI was not an interested party under 31 U.S.C. § 3553(a). In its opinion, the GAO indicated that it has not yet ruled on the protest filed by Philadelphia Produce. As such, as of this date, it appears that the original contract is still subject to the GAO stay.[6]

## II. DISCUSSION

In the case *sub judice*, defendant entered into a contract with Four Seasons to provide fresh produce to various commissaries in the Northeast United States. A protest to that contract was filed with the GAO, triggering the automatic stay. DeCA did not override that stay. Rather, it entered into an interim contract with Four Seasons to perform the exact same services required by the initial contract – the one that had been stayed. The interim contract, in fact, was timed to be coterminous with the expected pendency of the stay. That second contract was then protested, but this time DeCA issued a decision overriding the stay.

Plaintiff seeks a preliminary injunction enjoining DeCA from overriding the CICA stay, thereby barring further performance under the interim contract.[7] In order to obtain a preliminary

---

[5] Through problems that were encountered with the court's electronic digital recording system and which were discovered after the conclusion of the argument, neither a recording nor a transcript of the argument is available. Following the discovery of this problem, the court conducted a status conference at the conclusion of which it offered the parties the opportunity to file a brief recitation of any points raised at the oral argument that had not been mentioned in the briefs. All three parties filed such documents on October 11, 2006.

[6] The court gave the parties an opportunity to comment on the GAO decision. Plaintiff and defendant-intervenor filed such comments by the prescribed deadline; defendant did not.

[7] The parties have debated hotly whether the court may and should issue a declaratory judgment here, rather than a preliminary injunction. The relevant statute provides that this court "may award any relief that the court considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b)(2). Plaintiff asserts that a declaratory judgment would be sufficient to resolve this matter and notes that several decisions in this court have addressed the validity of override decisions by simply declaring them invalid. *See, e.g., CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 113-14 (2006); *Chapman Law Firm Co. v. United States*, 65 Fed Cl. 422, 424 (2005). None of these cases, however, involves a request for preliminary relief. Moreover, this court doubts whether, as several of these cases have stated, a declaration, that

injunction, plaintiff must demonstrate: (i) a likelihood of success on the merits; (ii) the harm to plaintiff outweighs the harm to defendant; (iii) the public interest is served by enjoining defendant; and (iv) irreparable injury to plaintiff if defendant is not enjoined, including, but not limited to, the absence of an adequate remedy at law. *See Delbert Wheeler Constr., Inc. v. United States*, 39 Fed. Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed. Cir. 1998). No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 656-57 (2003). Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.*, 56 Fed. Cl. 377, 380-81, *aff'd*, 365 F.3d at 1351 (Fed. Cir. 2003); *Seattle Sec. Servs., Inc.*, 45 Fed. Cl. 560, 566 (2000); *cf. Beta Analytics Int'l., Inc. v. United States*, 44 Fed. Cl. 131, 137 n.10 (1999).

The court will consider the parties' arguments regarding these injunctive elements *seriatim*.

**A. Likelihood of Success on the Merits**

Initially, the court must determine whether it is likely that it would overturn the override decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4). Regarding the latter standard, which is drawn from the Administrative Procedures Act, *see* 5 U.S.C. § 706(2)(A), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 731 (2000). By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983).

---

could immediately be superseded by a new override decision, is the equivalent of an injunction. Accordingly, at least in the circumstances presented, the court believes that injunctive relief is the more appropriate remedy.

The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 43; *see also OMV Med., Inc. v. United States*, 219 F.3d 1337, 1343 (Fed. Cir. 2000); *CIGNA*, 70 Fed. Cl. at 110; *PGBA*, 57 Fed. Cl. at 657.

Turning to the merits, the "automatic stay" provisions of CICA require federal agencies, upon receiving, within 10 days of a contract award, notice that the award is being protested, to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii)(2). This section further provides that "[p]erformance [of the contract] may not be resumed while the protest is pending." 31 U.S.C. § 3553(d)(3)(B). In the conference report to the Deficit Reduction Act of 1984, of which CICA was a part, the conferees wrote that, as a part of strengthening the bid protest function at the GAO, "a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced." H.R. Conf. Rep. No. 98-861 at 1435 (1984). As this court noted in *PGBA*, 57 Fed. Cl. at 657, "[t]he automatic stay was viewed as a key element of that mechanism." *See* H.R. Conf. Rep. No. 98-861 at 1435-36; H. Rep. No. 98-1157 at 23-25 (1984).[8] Thus, "the automatic stay is intended

---

[8] These points were reemphasized in H. Rep. No. 99-138 (1985), which was issued the year after CICA passed. Commenting on CICA, this report indicates that –

> [t]he act also establishes, for the first time in a statute, a strong enforcement mechanism through which contracts are held in abeyance while contractors appeal to the General Accounting Office (GAO) when they believe they have been unlawfully denied the opportunity to compete for the award of Government contracts. Congress included these bid protest provisions to help ensure that the mandate for competition would be followed and that vendors wrongly excluded from Federal contracts would receive fair relief.

*Id*. at 4. This report further notes that "Congress fully recognized that a major deficiency in the existing bid protest process was the inability to stop a contract award or contract performance while a protest was pending," observing that the result was that "[a]gencies . . . often proceeded with their contracts, simply ignoring the protest process." *Id*. at 4-5. As a result, in those instances in which GAO recommended relief that involved staying performance, the agencies often rejected that recommendation, finding that it was in the "best interests" of the government

to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard GAO's recommendations to cancel the challenged award," thereby "preserv[ing] competition in contracting and ensur[ing] a fair and effective process at the GAO." *Advanced Sys. Dev.*, 72 Fed. Cl. at 31; *see also* Robert M. Hanson, "CICA Without Enforcement: How Procurement Officials and Federal Court Decisions Are Undercutting Enforcement Provisions of the Competition in Contracting Act," 6 Geo. Mason L. Rev. 131, 136 (1997) ("CICA was given teeth in the form of an automatic stay of contract award or automatic suspension of contract performance in the case of post-award protests.").

Notwithstanding, CICA permits agencies, in some circumstances, to override the stay. Thus, with respect to post-award protests, the head of the contracting activity may authorize performance of a contract despite a protest, upon a "written finding" that –

> (I) performance of the contract is in the best interests of the United States; or
> (II) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i). In *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1291 (Fed. Cir. 1999), the Federal Circuit held that this court has jurisdiction under 28 U.S.C. § 1491(b) to review an agency's override decision. There, the Federal Circuit determined that this court could review the merits of an override independent of any consideration of the merits of the underlying contract award, stating:

> The language of § 1491(b), however, does not require an objection to the actual contract procurement, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement." The operative phrase "in connection with" is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction. Section 3553(c)(2) fits comfortably in that broad category.

*Id*. at 1289; *see also PGBA*, 57 Fed. Cl. at 658. As *RAMCOR* and a succession of cases make clear, this court, in particular, may review an agency override decision predicated upon "urgent and compelling circumstances" – and, indeed, defendant does not contest otherwise. *See, e.g.*, *Alion Sci. and Tech. Corp. v. United States*, 69 Fed. Cl. 14, 22-23 (2005); *Chapman Law Firm Co.*, 62 Fed. Cl. 464, 466 (2004).

---

to continue the contract. *Id*. The report then stated that "[a] key element of the Competition Act – an automatic stay of contract award or performance pending the Comptroller General's protest decision – was included to preclude such *faits accomplis* and to facilitate a fair and equitable remedy to vendors who are illegally denied Government contracts." *Id*; *see also Competition in Contracting Act of 1984: Hearings on H.R.5184 Before the Subcomm. on Legis. and Nat'l Security of the House Comm. on Gov't Operations*, 98th Cong. 9-10 (1984).

While override decisions are, by nature, fact specific, it is possible to distill from the relevant cases a variety of factors that an agency must consider in making an override decision based upon urgent and compelling circumstances, including: (i) whether significant adverse consequences will necessarily occur if the stay is not overridden, *see CIGNA*, 70 Fed. Cl. at 111; *Chapman*, 62 Fed. Cl. at 468; *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1378 (E.D. Va. 1993); *see also* FAR § 33.104(c)(3)(ii); (ii) conversely, whether reasonable alternatives to the override exist that would adequately address the circumstances presented, *see Alion Science*, 69 Fed. Cl. at 27-29; *Keeton Corrections, Inc. v. United States*, 59 Fed. Cl. 753, 758 (2004) ("existence of another contractor ready to begin performance simply cannot create the urgent and compelling circumstances needed to override the stay");[9] (iii) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs, *see Advanced Sys. Dev., Inc.*, 72 Fed. Cl. at 32; *Chapman Law Firm*, 62 Fed. Cl. at 468; *see also CIGNA*, 70 Fed. Cl. at 111-12; *PGBA*, 57 Fed. Cl. at 660-62; and (iv) the impact of the override on competition and the integrity of the procurement system, as reflected in the Competition in Contracting Act, *see Automation Technologies, Inc. v. United States*, 2006 WL 2720642 at *7 (Fed. Cl. Sept. 11, 2006); *Advanced Sys. Dev.*, 72 Fed. Cl. at 32; *CIGNA*, 70 Fed. Cl. at 113; *Keeton*, 59 Fed. Cl. at 757. The decisional law also indicates that certain factors are irrelevant to this analysis, among them: (i) that the new contract would be better than the old one, *see Advanced Sys. Dev.*, 72 Fed. Cl. at 31; *Chapman Law Firm*, 62 Fed. Cl. at 466; *CIGNA*, 70 Fed. Cl. at 113; *Keeton*, 59 Fed. Cl. at 113; *PGBA*, 57 Fed. Cl. at 662-63; or (ii) the override and continuation of the contract is otherwise simply preferable to the agency, *see Advanced Sys.*, 72 Fed. Cl. at 31.[10] As noted, for its override decision to be upheld, the

---

[9] Several courts have described this factor as obliging the agency show that "urgent and compelling" circumstances exist requiring it to proceed with the particular contractor selected. *See, e.g., DTH Mgmt. Group v. Kelso*, 844 F. Supp. 251, 256 (E.D.N.C. 1993); *Ace-Federal Reporter v. Federal Energy Regulatory Commission*, 1993 WL 518641 at *4-5 (D.D.C. 1990) (granting preliminary injunction in favor of current contractor to stay performance until resolution of protest before GAO because agency's failure to consider fact that current contractor was able to perform contract in interim before GAO's determination was contrary to purpose of the CICA to preserve status quo); *Samson Tug & Barge Co., Inc. v. United States*, 695 F.Supp. 25, 27, 29-30 (D.D.C. 1988) (granting current contractor's motion for a preliminary injunction because agency's failure to consider the availability of continuing its services while GAO decided protest was likely to prove arbitrary, capricious and contrary to law); *Universal Shipping Co., Inc. v. United States*, 652 F. Supp. 668, 675-76 (D.D.C. 1987) (granting permanent injunction in favor of current contractor and staying award of contract until resolution of pending protest before GAO because agency's failure to consider ability of contractor to continue services in interim in determining whether to lift stay was not rational or reasonable).

[10] Admittedly, some of the cases cited for the factors that are legally relevant and irrelevant in this context are ones in which the agency override decision was based upon the "best interests" of the United States. However, in the court's view, the rationale employed in those

agency must not only sort between the relevant and irrelevant factors, but must also render findings with respect to those that are relevant that do not "run[] counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also CIGNA*, 70 Fed. Cl. at 111-13; *Altos Fed.*, 60 Fed. Cl. at 834; *Keeton*, 59 Fed. Cl. at 755.

With this background, we begin with common ground – there is no question that providing fresh fruits and vegetables to service members and their families is vitally important, particularly during a time when so many soldiers are deployed overseas. And plaintiff does not even remotely suggest otherwise. Nor is there any doubt that providing this produce is important to the overall economic health of the commissary system. Yet, attaining these important goals does not give defendant license to disregard Federal procurement law and, particularly, the protections designed to ensure fair competition. Accordingly, it remains to determine whether, under the appropriate standards, the override decision made by DeCA was arbitrary, capricious, or otherwise contrary to law. For a host of reasons, the court concludes preliminarily that it was.

First, it appears that many of the critical findings made by DeCA in support of its override decision run counter to the evidence in the administrative record. To begin with, in asserting that the interim contract was "the only practical alternative" for obtaining produce during the interim period as there was "no incumbent contractor" with whom to extend performance, DeCA claimed that it could not continue its prior arrangement with DSCP because the latter agency had indicated that it was "unable" to provide that support. As reflected in an affidavit submitted by a DSCP director, DSCP gave three reasons for its purported inability: (i) that with a "reduced staff . . . performing functions that they would not typically perform, [DSCP] could not provide the level of support that DeCA expects, and did not want to damage [its] reputation as a world class provider by trying to do something without being appropriately resourced;" (ii) that DSCP had already notified certain of its employees of a reduction in force and did "not want to give [the employees] any false hopes by keeping them on for a relatively short period of time;" and (iii) that DSCP "did not want our vendors investing funds for a highly perishable commodity, for a brief period of time, and assume the risk of losing money to the loss of product or unfulfilled commitments." These rationales, however, wilt under scrutiny, particularly in the harsh light of the administrative record.

As a threshold matter, the notion that an override decision could be based upon agency concerns that providing what were termed "mission critical" services would "damage our reputation" and give employees "false hopes" is casuistry that reflects a virtual disregard for the types of circumstances that truly are "urgent and compelling." Clearly, while not entirely trivial, these are not the sort of considerations that should foreclose an agency from employing a prior arrangement as an alternative to overriding the stay and most certainly not the type of weighty considerations that this court has relied upon in upholding overrides. *See Chapman Law Firm Co. v. United States*, 67 Fed. Cl. at 192-93 (crediting HUD concerns that an override of the stay would pose public safety risks); *see also Advanced Sys. Dev.*, 72 Fed. Cl. at 31. Moreover, these

---

cases has, where indicated, application to the review of an override decision based upon urgent and compelling circumstances.

claims carry no more weight when expressed by one agency to another, particularly within the same department, than they would if expressed by the overriding component itself. To hold otherwise would be to suggest that "urgent and compelling" circumstances exist whenever one component of an agency simply refuses, for whatever reasons, to provide services to another, a position that threatens to render the GAO stay a farce.

The strongest of the rationales expressed by DSCP in support of its refusal is the implication that it lacked the staffing to continue the support function owing to the implementation of a reduction in force (RIF). But, ultimately, even this rationale is revealed as a paper ship at sea. Wittingly or not, DSCP's carefully-worded statements masked the fact that the planned reductions had not yet occurred. Indeed, while defendant has provided the court with somewhat conflicting information, it appears that only a few of the affected individuals had actually departed as of the time that DSCP indicated that it was "unable" to further support DeCA. Specifically, while it appears that approximately 28 of DSCP's staff were targeted for the RIF, only three or four of these individuals had actually departed as of the time that DSCP notified DeCA that it could not continue to provide the produce services – and nearly 80 percent of these individuals remain on the job to this day. Other documents in the record, indeed, suggest that the above cited statistics represent only a portion of DSCP's produce staff and do not account for the as many as 120 field employees dedicated to this function, who apparently remain on DSCP's rolls.

These statistics buttress statements made in a declaration, supplied by plaintiff, from Dana C. Waters, who was, until he retired on August 3, 2006 (barely a month before the override decision), the Chief of the Operations Branch for the Produce Unit of the DSCP. In the latter role, Mr. Waters apparently provided oversight over all DSCP produce operations in the United States and thus is well-versed on the subject at hand. In this declaration, he states that "based upon my experience as the Chief of the Operations Branch for the Produce Unit at DSC-P, and the fact that DSC-P agreed with DeCA that DSC-P would continue to support DeCA until DeCA's contracts with vendors were in place, DeCA's justification for entering into an interim contract is not reasonable." Mr. Waters continues by declaring that "DSC-P could immediately resume deliveries to, and fulfill all requirements of, all DeCA commissaries by utilizing existing [blanket purchase agreements] held by incumbent contractors currently servicing commissaries in Area 3, Groups 1 and 2," and that "DSCP has the necessary staff and resources to continue this resumed service and make all necessary deliveries and fulfill all requirements for the duration of interim Contract No. HDEC02-06-D-0017." While defendant contests the accuracy of these statements, the administrative record contains evidence that supports these claims. Among this evidence is not only the employment statistics listed above, but clear indications in e-mails and other documents that DSCP is still providing produce to commissaries in other regions of the country (*e.g.*, the southwestern United States) and the world (*e.g.*, Europe) using the types of blanket purchase agreements (BPAs) to which Mr. Waters referred.[11] Of course, the continued

---

[11] Thus, an August 21, 2006, e-mail from DeCA to DSCP described:

> For the European locations, my staff is currently coordinating the transition directly with your staff at DSC-PE . . . . Because of a mutual interest between our

use of such BPAs to provide produce to a large number of commissaries thoroughly rebuts defendant's theoretical claims that logistics and other impediments prevented it from obtaining the necessary fresh produce through such purchase agreements.[12]

Lastly, in this regard, it should be observed that DSCP's concern that its vendors might lose money if they purchased produce that was not delivered is a neutral proposition as the identified risk would be borne by any vendor who contracted with DoD to provide fresh produce on an interim basis. Moreover, DeCA undoubtedly could have entered into a memorandum of understanding or other reimbursement agreement ensuring that neither the contractors nor DSCP would be liable for any losses incurred as the result of failed deliveries – at least there is no evidence to the contrary. Indeed, logic suggests that the risk that DSCP's preexisting vendors would have their shipments halted midstream by application of the GAO automatic stay was significantly less than the risk posed by awarding the interim contract to the contractor whose prior award of essentially the same contract had already being protested. Accordingly, it appears from the record that DSCP did not lack the capacity to continue its prior arrangement for supplying produce to the affected commissaries and that DeCA was well aware of this. Rather, assuming good faith, DSCP's position, at best, can reasonably be viewed as amounting to an unwillingness to provide the services it had provided in the past – a determination that defendants admits that DeCA did not challenge within the DoD hierarchy. In the court's preliminary view, in the circumstances presented, DeCA was in no position to characterize DSCP's position as being "unable" to provide services, when, in fact, it knew otherwise. Rather, at this point, its acquiescence appears to stem from what this court has characterized as a "generic desire to get on with the procurement" – and that is not a proper basis for an override. *Advanced Sys. Dev.* 72 Fed. Cl. at 31.

Second, while, until oral argument, defendant steadfastly maintained that it had no alternative but to employ the CICA override, it does not appear that DeCA adequately considered reasonable alternatives. For example, as suggested above, DeCA did not adequately consider the

---

> agencies in continuing to process combined contractor orders for certain commodities, there will continue to be some shared contractual arrangements. I've been advised that the DSC-PE staff has proposed an innovative contractual delegation of authority that will permit DeCA to order directly from these remaining shared instruments, thereby serving the interest of both agencies.

[12] At points, defendant asserts that various statutes limit its options. For example, it claims that having DeCA place orders through the existing DSCP BPAs could result in a violation of the Anti-Deficiency Act, 31 U.S.C. § 1341, *et seq*. If this problem exists at all – and defendant neither explains nor supports it claim – it would appear to be easily solved by the use of reimbursement agreements and other forms of memoranda of understanding that apparently typically were employed by DSCP and DeCA. In many ways, the *post-hoc* invocation of these make-weight limitations only serves to amplify that DeCA's original rationale for overriding the stay has a decidedly hollow ring.

possibility of either reissuing the existing BPAs to provide the necessary produce or placing orders on the DSCP agreements themselves. While, through various affidavits, defendant now asserts that the use of such BPAs would present budget, personnel and administrative difficulties, the administrative record reveals that such hurdles either did not exist at all or were readily overcome in the regions of the world where DSCP continues to provide fresh produce to commissaries. *See Envirosolve LLC*, 2005 C.P.D. ¶ 106 n.3 (a "BPA is a simplified method of filling anticipated repetitive needs for supplies or services"); *Boehringer Manhein Corp*., 98-1 C.P.D. ¶ 141; FAR § 13.303-1, 13.303-2. And, it bears noting that similar BPAs with DSCP remain in effect and cover the affected regions.[13] Moreover, defendant admits that it could have conducted a broader interim procurement, involving more than the two highest-rated offerors on the initial protested solicitation. Had it done so, those offerors might have submitted modified proposals more narrowly tailored to the needs of the interim contract, thereby yielding a different evaluation that might not have favored Four Seasons.[14] Nor did defendant apparently consider the use of sole-source procurements with vendors others than Four Seasons to meet its needs. It apparently also did not explore ways in which to simplify or streamline its produce requirements for the affected region during the interim period. *See Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 381 (2004) (noting that the urgency justification cannot support more than the minimum quantity and time needed to satisfy immediate urgent requirements). Again, it is not so much the way in which these alternatives were explored, but the fact that most of them apparently were not explored at all, that casts considerable doubt on the rationality of DeCA's override decision. *See Dairy Maid Dairy*, 837 F. Supp. at 1379 (override of stay of contract to provide milk to military personnel and their dependents held arbitrary and capricious where alternatives not properly explored).

Finally, it appears, at least from the administrative record, that DeCA did not consider a number of "variable[s] that should have been an important aspect" of its review. *PGBA*, 57 Fed.

---

[13] The terms of the DSCP BPAs appear to contradict various claims made by defendant. For example, while defendant asserts that DeCA could not place orders on those BPAs, the BPA plaintiff has with DSCP for Fiscal Year 2006 and Fiscal Year 2007 states that managers employed by DeCA are authorized to order against the BPA during various periods "when service cannot be provided or orders cannot be placed by" DSCP personnel. Indeed, defendant's claim that DSCP could not further delegate authority to DeCA is belied by discussions in various e-mails suggesting that such delegations could be accomplished. Defendant also blithely asserts that the BPAs could be employed only to make purchases of up to $100,000 per month. Yet, the relevant BPAs state that "[i]ndividual purchases for subsistence items are not subject to dollar limitations."

[14] Notably, the original solicitation included technical evaluation factors that likely were not as important to an interim contract, such as how the produce provider conducted promotional campaigns and prepared holiday displays. A review of the technical scores on the original solicitation, in fact, suggests that were this factor eliminated, a number of other competitors would have had technical scores nearly identical to those of Four Seasons.

Cl. at 662. For example, there is no indication that DeCA considered whatsoever the potential cost and other impacts of having its override decision set aside. More importantly, it seems to have turned a blind eye to the impact of its decision on the integrity of the Federal procurement system. Unfortunately, there are indications that this lack of focus did not begin with the override decision. The record reveals, for example, that after performance of the initial contract was stayed, defendant continued to conduct training sessions with Four Seasons, an action that appears to violate the CICA stay. Defendant's insensitivity to competition concerns is also reflected in the way that it conducted the interim procurement. In this regard, FAR § 6.302-2(c)(3) allows for procurements on less than full and open competition where there is "urgent and compelling circumstances," but requires "that the agencies shall request offers from as many potential sources as is practicable under the circumstances." While defendant asserts that it satisfied this requirement, the record suggests otherwise. Thus, for example, on September 7, 2006, the day after DeCA initiated the interim procurement and before it had even heard back from MPG, the second of the two contractors it had contacted, the contracting officer wrote in a memorandum that "[w]e will continue on the path discussed during a meeting this morning with GC, the CBU and this office to establish an interim, bridge contract to provide for FF&V support from Four Seasons Produce, Inc." Accordingly, it appears that, from the start, the result of the interim procurement was preordained – Four Seasons would be selected and other potentially viable competitors would be excluded.

But, of course, it is for the GAO and not this court to review the propriety of the interim award. *See Automation Techs.*, 2006 WL 2720642 at *4; *Chapman Law Firm Co.*, 67 Fed. Cl. at 191. What is relevant for our purposes is that DeCA all but ignored the fact that, in a process that reflected no new competition, it was awarding the interim contract to the same contractor to whom the challenged contract had been awarded. While in its override decision, DeCA stated that it had "honored the intent of the Competition in Contracting Act (CICA) by staying the award made under the full-term contract and instead used a limited term or 'bridge' contract," this statement seems little more than lip service, as the action actually taken was tantamount to overriding the automatic stay on the initial contract, as least in competitive terms – even in the law, actions speak louder than words. At the least, from a competition standpoint, awarding the contract to Four Seasons should have been viewed not as a first, but a last resort, undertaken only after all reasonable alternatives were fully explored. But, given the state of the administrative record, one is left with the impression – at least for the moment – that the decision to give the interim contract to Four Seasons was viewed as a way to circumvent the stay, thereby undercutting the important policy considerations underlying the collective Congressional wisdom to create the stay, in the first instance.

In sum, the court finds that plaintiff has demonstrated a likelihood that DeCA's override decision was arbitrary, capricious and otherwise contrary to law. Contrary to defendant's claims, the situation encountered here appears to be markedly different from that encountered in other cases that have upheld CICA overrides relating to interim or bridge contracts (often with incumbent contractors). *See, e.g., Chapman Law Firm*, 67 Fed. Cl. at 192. In particular, it appears that many of the circumstances that DeCA now faces are the result of a "lack of advance planning," *Filtration Dev. Co.*, 60 Fed. Cl. at 381, typified by its failure to pursue continuation of

its arrangement with DSCP in the face of the latter agency's apparent prior unwillingness to perform. Accordingly, the court concludes that plaintiff has demonstrated a likelihood of success on the merits.

### B. Balance of Hardships

Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government and to the intervening defendant. On this count, the government essentially reiterates the grounds it asserted in support of the override decision. However, these assertions are no more compelling the second time around, particularly given the concessions made by defendant's counsel at oral argument that alternative means for providing produce to the affected facilities are available. Defendant's counsel, of course, indicated that providing those alternative means could entail delay. But, this court has observed that "'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *PGBA*, 57 Fed. Cl. at 663 (quoting *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999)). This is not such an "exceptional case," particularly as it appears that some of the problems encountered here are, at least in part, of defendant's own making, resulting from its (apparent) failure to factor into its transition schedule any time for the bid protests and from the somewhat cavalier fashion in which it appeared to approach the interim procurement. Moreover, any adverse impact on defendant associated with the granting of an injunction may be ameliorated by delaying the effective date of this injunction, which this court is prepared to do.[15]

---

[15] The day after the argument, October 11, 2006, defendant filed a document in which it indicated that it needed at least 21 days to put into place an alternative mechanism for supplying the affected facilities with fresh produce. While the court is prepared to provide defendant with some time to ensure the uninterrupted flow of produce, it cannot agree to the 21 days requested for several reasons. For one thing, this claim is made without the support of affidavits and by the same party who, up until October 10, 2006, had steadfastly maintained that such alternatives did not exist or were infeasible. Accordingly, the court has serious doubts that all of the time requested is actually necessary. Those doubts are reinforced by two observations: (i) it took DeCA only seven days (from September 5, 2006, until September 12, 2006), to obtain the interim contract; and (ii) plaintiff has indicated, by affidavit, that it and other suppliers would be ready to deliver produce to the affected facilities on 24-hour notice. Finally, it should be noted that more than 21 days have elapsed since plaintiff filed suit in this court seeking, *inter alia*, a temporary restraining order and preliminary injunction. Accordingly, even with a short delay in effectuating the injunction, a significant portion of the CICA stay period will have elapsed before the stay is reinstituted. Moreover, defendant has had at least the period since this suit was filed to contemplate how it would proceed were its override decision set aside. One would hope that, despite its advocacy to the contrary, it did not wait until the oral argument in this case to begin considering what it would do if a preliminary injunction were issued. If it did wait, then it only has itself to blame for any interruption in service that might unfortunately occur.

Under the circumstances, the court does not believe that the issuance of a properly-framed injunction would interrupt the supply of fresh fruit and vegetables to the affected facilities. *See Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. at 1381-82 (rejecting, as unfounded, a claim that the supply of product would be interrupted and morale will be adversely affected); *see also PGBA*, 57 Fed. Cl. at 663. Nor does it believe that the defendant-intervenor would be significantly harmed by a preliminary injunction, as defendant would likely be liable for any unavoidable costs incurred as the result of a work stoppage. Accordingly, the balance of hardships tilts in the plaintiff's favor.

**C. Public Interest**

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA*, 57 Fed. Cl. at 663; *see also Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 448 (1993). In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process – such, indeed, clearly was Congress' view in providing that, except in circumstances not yet demonstrated here, the automatic stay should prevail. In so holding, the court is mindful of the benefits that the interim contract offers to military families. But, those same beneficiaries, as well as the public at large, also have a long-term interest in ensuring that the new contract represents the best overall value to the government. Given the fact that there is no real indication that reinstituting the stay will impair services to a significant extent, the court believes that these long-term interests are paramount here and are best served by issuing the proposed injunction. *See PGBA* ,57 Fed. Cl. at 663*; Metcalf Constr. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002); *DTH Management Group v. Kelso*, 844 F. Supp. 251, 255 (E.D.N.C. 1993).

**D. Irreparable Injury**

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp.*, 27 Fed. Cl. at 447. Plaintiff complains that this court's failure to issue a preliminary injunction will result in a competitive disadvantage, asserting, *inter alia*, that Four Seasons will be competitively advantaged by participating in the interim contract. This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm, *PGBA*, 57 Fed. Cl. at 664; *Overstreet Elec. Co.*, 47 Fed. Cl. at 744; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000), and, in the court's view, the injury claimed by plaintiff is similar. Indeed, Congress enacted the automatic stay on the premise that the failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, causing a contractor to lose an important business opportunity. *See, e.g., Lear Siegler, Inc*., *v. Lehman*, 842 F.2d 1102, 1105 (9th Cir. 1988), *mod. on other grounds*, 893 F.2d 205 (9th Cir. 1989); *PGBA*, 57 Fed. Cl. at 664; *DTH Management Group,* 844 F. Supp. at 254-55.

Plaintiff's irreparable harm claim undoubtedly is undercut by the GAO's dismissal of its protest on the original contract. But, the question is – how much? At this preliminary stage, the court is not positioned to conclude that plaintiff has no reasonable likelihood of obtaining the original contract, should it be resolicited. Further amplification of that issue, which implicates the relief that may be ordered upon a sustained protest, may occur if a bid protest action challenging the original contract award is filed in this court. Of course, should that occur, the GAO's decision will not be binding. *See Corrigan v. United States*, 70 Fed. Cl. 665, 673 (2006). Accordingly, while it is an exceedingly close call, the court finds that, on balance, plaintiff has adequately demonstrated that it will suffer irreparable harm if preliminary injunctive relief is not granted.[16]

## III. CONCLUSION

The court finds that the prerequisites for issuing a preliminary injunction have been satisfied here. In consideration of the above:

1. Plaintiff's motion for preliminary injunction should be, and is hereby, **GRANTED**.

2. Pending further order of the court, defendant, acting by and through the Department of Defense, as well as Four Seasons Corp., are hereby **ENJOINED** from performing on contract HDEC02-06-D-0017, awarded to Four Seasons Produce, Inc. on September 12, 2006. Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under the contract.

3. To allow the Department of Defense time in which to ensure the uninterrupted flow of fruit and vegetables to the affected facilities, this order is **HEREBY STAYED** through and including, October 20, 2006. Thereafter, it shall apply immediately with full force.

4. Pursuant to RCFC 65(a), plaintiff shall give security in the amount of $100,000.00 for the payment of such costs and damages as may be incurred or suffered in the event that future proceedings prove that this injunction was issued wrongfully. Plaintiff shall file proof

---

[16] Even if this were not the case, the court would, nonetheless, grant the requested preliminary injunction based on its weighing of the other three injunctive factors. *FMC Corp.*, 3 F.3d at 427. Moreover, the court does not believe that the dismissal of plaintiff's protest as to the first contract renders it not an "interested party" for purposes of review in this court, particularly as its protest to the interim contract remains pending. *See Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

of security with the Clerk of Court. The Clerk shall hold the bond until this case is closed.

5. The court is prepared to move promptly to a determination of the ultimate merits in this matter. Toward that end, on October 17, 2006, the parties shall file with the court a joint status report proposing a schedule for final resolution of this matter.[17]

6. This order shall be published as issued after October 24, 2006, unless the parties identify, with particularity, protected and/or privileged materials subject to redaction prior to said date.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

[17] Should the GAO, prior to a final decision herein, resolve the pending protest, the court will remove the injunction herein, which is designed only essentially to require the Department of Defense to comply with the stay provisions of CICA.