**Agreed-Upon Redacted Copy– May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| REILLY'S WHOLESALE PRODUCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-668C |
| | ) | bid protest |
| v. | ) | (Judge Allegra) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, and | ) | |
| | ) | |
| FOUR SEASONS PRODUCE, INC. | ) | |
| | ) | |
| Intervenor. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DEBORAH A. BYNUM
Assistant Director

DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 305-7643

OF COUNSEL:

THOMAS D. RATHGEB
Deputy General Counsel – Litigation
Defense Commissary Agency
1300 E Avenue
Fort Lee, VA 23801-1800

electronically filed,
October 3, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Course Of Proceedings In this Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Background On DeCA And The Supply Of Produce To Military Commissaries . 4

II. The Transition And Contract Award In Area 3 . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. The Substantive "Arbitrary And Capricious" Standard . . . . . . . . . . . . . 10

B. The Standard For Preliminary Injunctive Relief . . . . . . . . . . . . . . . . . . . 11

II. This Court Should Not Award Injunctive Relief Without Consideration Of The Injunctive Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. RWPI's Request For Preliminary Injunctive Relief Should Be Denied . . . . . . . 14

A. The Written Finding of DeCA's Director Is Rational And Lawful And, Therefore, RWPI Has Failed To Demonstrate A Likelihood Of Success On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The Interim Contract Was The Only Reasonable Alternative Vehicle Through Which DeCA Could Provide FF&V To Area 3 Commissaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. DeCA's Urgent And Compelling Determination Did Not Arise Because Of A Lack of Advance Planning . . . . . . . . . . . . . . . . . . 24

B. The Balance Of Harms Compels The Denial Of RWPI's Motion . . . . . . 26

1. No Irreparable Harm To RWPI Would Result From Denying Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. Because An Injunction Would Leave DeCA With No Means To Supply FF&V To Military Commissaries In The Northeastern United States, The Harm To The United States And Third Parties Far Outweighs Any Harm To RWPI . . . . . . . . . . . . . . . . . . . . . . 28

C. Denying Injunctive Relief Is In The Public Interest . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**TABLE OF AUTHORITIES**

Page

Federal Cases

Advanced Data Concepts, Inc. v. United States,
216 F.3d 1054 (Fed. Cir. 2000) . . . . . . . . . . 10

Advanced Sys. Dev. v. United States,
72 Fed. Cl. 25 (2006) . . . . . . . . . . 12, 17, 18

Alion Sci. & Tech. Corp. v. United States,
69 Fed. Cl. 14 (2005) . . . . . . . . . . 20

Automation Techs., Inc. v. United States,
2006 WL 2720642 (Fed. Cl. Sept. 11, 2006) . . . . . . . . . . 12,17,18

Bannum, Inc. v. United States,
60 Fed. Cl. 718, 723-24 (2004) . . . . . . . . . . 11

Bean Stuyvesant, LLC v. United States,
48 Fed. Cl. 303 (2000) . . . . . . . . . . 11

Bowman Transp., Inc. v Arkansas-Best Freight Sys.,
419 U.S. 281 (1974) . . . . . . . . . . 10

CACI, Inc. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) . . . . . . . . . . 11

Camp v. Pitts,
411 U.S. 138 (1973) . . . . . . . . . . 10

CCL Serv. Corp. v. United States,
48 Fed. Cl. 113 (2000) . . . . . . . . . . 11

Chapman Law Firm Co. v. United States,
62 Fed. Cl. 464 (2004) . . . . . . . . . . 11, 18

Chapman Law Firm Co. v. United States,
67 Fed. Cl. 188 (2005) . . . . . . . . . . 17, 22, 28, 29

Chapman Law Firm Co. v. United States,
65 Fed. Cl. 422 (2005) . . . . . . . . . . 12, 14

Cigna Gov't Servs., LLC v. United States,
70 Fed. Cl. 100 (2006) . . . . . . . . . . 10, 12

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . 11

Filtration Dev. Co., LLC v. United States,
59 Fed. Cl. 658 (2004) . . . . . . . . . . 25

Filtration Dev. Co., LLC v. United States,
60 Fed. Cl. 371 (2004) . . . . . . . . . . 25

FMC Corp. v. United States,
3 F.3d 424 (Fed. Cir. 1993) . . . . . . . . . . 11

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) . . . . . . . . . . 10

Hospital Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618, 619 (2005) . . . . . . . . . . 22

Keeton Corrections, Inc. v. United States,
59 Fed. Cl. 753 (2004) . . . . . . . . . . 10-12, 18, 21

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . 11

Overstreet Elec. Co., Inc. v. United States,
59 Fed. Cl. 99 (2003) . . . . . . . . . . 26

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) . . . . . . . . . . 12-14

PGBA, LLC v. United States,
57 Fed. Cl. 655 (2003) . . . . . . . . . . 10, 11, 18, 24, 26, 28

RAMCOR Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999) . . . . . . . . . . 10

Sierra Military Health Servs. v. United States,
58 Fed. Cl. 573 (2003) . . . . . . . . . . 27

Spherix, Inc. v. United States,
62 Fed. Cl. 497 (2004) . . . . . . . . . . 12, 14, 16, 27

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Federal Statutes

10 U.S.C. § 2304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10 U.S.C. § 2484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

31 U.S.C. § 1341 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

31 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Federal Regulations

FAR § 1.701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FAR § 33.104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

FAR § 13.303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FAR § 13.303-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FAR § 6.302-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 23

Administrative Decisions

Matter of: Tri-Ex Tower Corp.,
B-239628, 90-2 CPD ¶ 221 (Comp. Gen. Sept. 17, 1990) . . . . . . . . . . . . . . . . . . . . . . . 25

**Agreed-Upon Redacted Copy– May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| REILLY'S WHOLESALE PRODUCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-668C |
| | ) | bid protest |
| v. | ) | (Judge Allegra) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, and | ) | |
| | ) | |
| FOUR SEASONS PRODUCE, INC. | ) | |
| | ) | |
| Intervenor. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Rule 7 of the Rules of the United States Court of Federal Claims ("RCFC"), and the scheduling order dated September 28, 2006, defendant, the United States, respectfully opposes plaintiff's motion for a preliminary injunction. In opposing plaintiff's motion, we rely upon the complaint, the administrative record, the following brief, and the documents submitted in conjunction with this brief.

**STATEMENT OF THE ISSUES**

1. Whether the written finding of the Director of the Defense Commissary Agency ("DeCA"), who is also the head of contracting activity for the agency, pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3)(C)(i), that urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for a decision by the Government Accountability Office ("GAO") regarding plaintiff's protest of the award, is arbitrary, capricious, or an abuse of discretion.

2. Whether the Court should preliminarily enjoin DeCA from authorizing

performance of the interim contract pending the GAO's decision when plaintiff will not suffer irreparable harm and the balance of harms clearly favors the Government.

## STATEMENT OF THE CASE

### I. Nature Of The Case

On September 19, 2006, plaintiff, Reilly's Wholesale Produce, Inc. ("RWPI") filed a GAO bid protest with respect to DeCA's award of contract no. HDEC02-06-D-0017 (the "interim contract"). AR 6-19.[1] This contract is a short-term contract awarded to intervenor, Four Seasons Produce, ("FSP"), for the supply of fresh fruits and vegetables ("FF&V") to military commissaries in the Northeastern region of the United States ("Area 3"). AR 37-67. The performance period for the interim contract is 120 days, September 12, 2006 through January 11, 2007, with two 30-day option periods. AR 45. The interim contract was awarded to ensure the continuity of these essential services when DeCA's award of a long-term FF&V contract for Area 3 was delayed by two protests filed with the GAO. See Philadelphia Produce Market Wholesalers, LLC, No. B-298751.1 (filed September 1, 2006); Reilly's Wholesale Produce, Inc., No. B-298751.2 (filed September 5, 2006). Compl. ¶ 22.[2]

This action concerns whether DeCA's determination to override the automatic stay of the interim contract because of urgent and compelling circumstances that significantly affect the interest of the United States, is arbitrary, capricious, or an abuse of discretion.

### II. Course Of Proceedings In this Action

On August 22, 2006, DeCA awarded contract no. HDEC02-06-0013 (the "long-term

---

[1] "AR__" refers to the administrative record filed in this case on September 29, 2006.

[2] "Compl.__" refers to the complaint in this matter, filed with the court on September 25, 2006.

contract") to FSP for the supply of FF&V to military commissaries in Area 3. AR 215-248. The contract was for a two-year performance period, beginning September 22, 2006, with two additional one-year option periods. AR 223. After two bid protests were timely filed in the GAO, DeCA suspended performance on the long-term contract. AR 82. Because there was no incumbent contractor to supply FF&V to Area 3 and noting that FF&V are an essential category of products for military commissaries, DeCA decided to award an interim contract to FSP on September 12, 2006. AR 69-74. Because of an unusual and compelling urgency, and in accordance with FAR § 6.302-2, DeCA awarded the interim contract based upon the results from its recently conducted competitive acquisition for the long-term contract. AR 72. After RWPI timely protested the award of the interim contract with the GAO, the Director of DeCA, Patrick B. Nixon, determined that urgent and compelling circumstances that significantly affect the interests of the United States justified overriding the automatic stay of performance for the interim contract. AR 5. On September 20, 2006, Mr. Nixon issued a written determination and findings. AR 3-5.

On September 25, 2006, RWPI filed this action, seeking a temporary restraining order, preliminary and permanent injunctive relief, and declaratory relief. Compl. ¶ 1, Pl. Mot. at 1.[3] RWPI alleges that DeCA's decision to override the automatic stay of the interim contract was arbitrary, capricious, an abuse of discretion, and in violation of CICA. Compl. ¶ 40. RWPI further alleges that DeCA's determination and findings ("D&F") fails to explain why urgent and compelling circumstances required that the interim contract had to remain in place pending resolution of the GAO bid protests, and fails to consider alternative contracting vehicles for the

---

[3] "Pl. Mot. __" refers to plaintiff's motion for a temporary restraining order, preliminary injunction, and declaratory relief, filed on September 25, 2006.

supply of FF&V during the duration of the GAO bid protests. Compl. 42. At the initial status conference with the Court on September 27, 2006, the parties agreed to an accelerated briefing schedule upon plaintiff's motion for a preliminary injunction.

## STATEMENT OF FACTS

I. Background On DeCA And The Supply Of Produce To Military Commissaries

DeCA operates the United States military's grocery stores worldwide. Ex. B, ¶ 2.[4] It was created on October 1, 1991, as a new defense agency by merging the existing commissary systems of the Army, Air Force, Navy and Marine Corps into one entity. Id. Military commissaries "mirror" commercial grocery stores, and may sell merchandise similar to that sold in commercial grocery stores. 10 U.S.C. § 2484(a). The military commissaries provide a benefit to military members, their families, retirees, and reservists, by selling grocery items at reduced price (at cost, plus a surcharge). Ex. B, ¶ 2. The low cost of these items is considered part of the compensation package that they receive for their service to our country. Id. The savings provided to members of the military by the commissary is an important element of the military compensation package. Id.

Produce is considered to be a destination category for commissary shoppers, meaning that shoppers will come to the store specifically to acquire produce and related items. AR 69. The primary concern of customers in regard to FF&V is the quality of the produce they purchase. Ex. B ¶ 3. FF&V have become increasingly important to commissary shoppers in recent years because of the military's increased emphasis on healthy lifestyles and physical fitness. Id.

DeCA has historically secured its FF&V through the Defense Supply Center–Philadelphia

[4] "Ex. __" refers to the exhibits attached to this response.

("DSC-P"). AR 3. DSC-P is a sub-agency of the Defense Logistics Agency, an agency of the Department of Defense. Ex. B ¶ 4, Ex. A ¶ 2. DSC-P's infrastructure/network facilitated the acquisition and delivery of FF&V to DeCA facilities worldwide, at a fee to DeCA. AR 3. DSC-P purchased produce through blanket purchase agreements ("BPA") that each vendor supplying produce executed with DSC-P. Ex. B ¶ 10, Compl. ¶¶ 30, 31.

Because commissary shoppers demand high quality, low price produce, DeCA has always been a demanding customer for DSC-P. Ex. B ¶ 5, Ex. A ¶ 4. Because the FF&V supplied by DSC-P to military commissaries were equivalent to those supplied to institutional buyers such as dining facilities, prisons, and aircraft carriers, the FF&V acquired for DeCA by DSC-P did not always meet the requirements of its patrons. Ex. B ¶ 5. Additionally, because DSC-P's business model had multiple organizational layers between the FF&V in the field and the produce getting to the shopper's kitchen, each layer added costs and handling charges to the end product. Id. Consequently, military service members were not able to enjoy the same degree of savings for FF&V as they did for other commissary items procured through direct competition, negotiation and contracting. Id.

Accordingly, as early as 2004, DeCA began researching alternatives to securing FF&V through DSC-P. Ex. C ¶¶ 2-4. As a result of this planning process, DeCA elected to conduct a test of what they considered to be some of the best commercial practices, and awarded a formal contract in December 2004 to a small business concern in Tidewater, Virginia, to provide FF&V to 20 commissary locations. Ex. B ¶ 6, Ex. C ¶ 5. The primary purpose of this contract was to test whether the produce industry could use commercial methods to provide FF&V at reduced costs to military commissaries. Ex. C ¶ 5. During this test contract period, DeCA also sought

input from other members of the produce industry, including recommendations about how DeCA should consider conducting its FF&V program in the future. Ex. C ¶ 6. The results of the test contract were very favorable. Ex. B ¶ 6, Ex. C ¶ 8.

In late 2005, after reviewing the proposed business plans from both DeCA and DSC-P, the Department of Defense determined that DeCA should pursue a course that would allow DeCA to contract directly for its FF&V requirements in the future. AR 3. On November 2, 2005, DeCA attended a meeting at DSC-P to discuss a joint transition plan. Ex. C ¶ 13. The agreed upon target date by which to have completed the transition from DSC-P support to DeCA direct acquisition was September 30, 2006. Id. Consequently, DeCA began an aggressive transition schedule that would allow for DeCA assumption of coverage before the September 30, 2006 deadline. Id. ¶ 14.

As DeCA awarded its contracts, specific transfer dates were coordinated with DSC-P. AR 251-63. As a result of the switchover, DSC-P downsized and reduced personnel as DeCA implemented its strategic plan for assuming the contracting responsibility for FF&V acquisition by geographic area. AR 78. The United States was divided into six areas for the conversion. AR 81.

DSC-P committed to support DeCA through the end of Fiscal Year 2006, or September 30, 2006, for their produce needs. Ex. A ¶ 7. DSC-P's produce acquisition and distribution network consisted of 18 different offices and over 120 personnel, and DSC-P considered it to be vital to transition with DeCA throughout Fiscal Year 2006, so that it could release its personnel and provide them with ample opportunity to pursue other options. Ex. A ¶ 6. In fact, DSC-P has already initiated the requisite personnel actions to remove their field buying personnel from its

rolls through announced reduction-in-force ("RIF") notices. AR 4; Ex. A ¶¶ 6-7. With the exception of the Southwestern United States and Hawaii (Area 6), DeCA was to assume full performance coverage for all areas of the continental United States ("CONUS") by October 1, 2006. AR 259. Under the FF&V transition program to date, DeCA has issued a total of five solicitations, and awarded a total of seven formal contracts. Of those seven awards, five are proceeding without protest. Ex. C ¶ 17.

II. The Transition And Contract Award In Area 3

The solicitation for Area 3 (which covered 41 commissary locations in the Northeastern United States, solicitation no. HDEC02-06-R-0005 was issued on March 20, 2006. Pl. App. at Tab 1.[5] Multiple firms submitted proposals and those proposals were evaluated based upon technical capability, past performance, and price. AR 5, 249. After the proposals were evaluated, [*********************************]. AR 249. [*********************]. Id. DeCA awarded a formal contract (contract no. HDEC02-06-C-0013) to FSP on August 22, 2006 for all 41 store locations in Area 3. AR 35, 215-248. After two GAO protests were timely filed, AR 86-102, 138-214, DeCA suspended the performance of the long-term contract, AR 82, and considered its options for maintaining the supply of this essential food category to its commissaries in the Northeastern United States. DeCA asked DSC-P to continue to provide support for Area 3 during the pendency of the GAO protest, and DSC-P stated that it could not support DeCA's requirements beyond October 1, 2006. AR 264, Ex. A ¶ 8, Ex. C ¶ 21.

Accordingly, DeCA was faced with two alternatives in order to secure FF&V for Area 3: (1) override the automatic stay or (2) award an interim contract. AR 4. DeCA management

[5] "Pl. App. __" refers to the appendix filed with plaintiff's motion for a temporary restraining order, preliminary injunction, and declaratory relief.

decided that the best course of action was to pursue an interim contract through the most expedious means available. Id. The need for FF&V for Area 3 was urgent and compelling. It is an essential product for military commissaries and is considered "mission essential" for DeCA. AR 75. Because DSC-P stated that it could not support DeCA beyond October 1, 2006, and assuming that any contract for FF&V for Area 3 requires some necessary preparation work and time before deliveries can begin, DeCA decided to award the interim contract based upon the results of the recently completed, fully-competitive solicitation for Area 3. AR 70. As noted above, there were multiple proposals submitted in response to this solicitation. DeCA elected to utilize the procedures authorized by FAR § 6.302-2 (Unusual and Compelling Urgency) and communicated with the two offerors who had the best technical scores and inquired whether they would be interested in an interim contract. AR 75. Both offerors responded affirmatively. AR 76-77. Both offerors also responded that they were willing to perform the interim contract under the same terms and conditions as they proposed in response to the solicitation for the long-term contract. AR 75. Because [*****************] and given the urgency of the situation, DeCA determined that it would award the interim contract of 120 days to FSP for the same services as were advertised in the original solicitation. AR 72. The interim contract was awarded to FSP on September 12, 2006, for a performance period of 120 days, with two 30-day options, which are to be utilized only if the final decision of the GAO requires the agency to complete additional administrative tasks prior to performance under a long-term contract award. AR 37, 68.

RWPI filed a GAO protest against the award of the interim contract on September 19, 2006, AR 6, and DeCA quickly recognized that the CICA stay provisions were applicable. Ex. C ¶ 25. Recognizing that the stay would result in the discontinuation of the supply of FF&V to

military commissaries in Area 3, on September 20, 2006, the head of contracting authority for DeCA issued a written D&F overriding the stay of the interim contract based upon urgent and compelling circumstances. AR 3-5. It is this override decision which plaintiff now challenges.

## SUMMARY OF THE ARGUMENT

The Court reviews the agency head's written "urgent and compelling" finding pursuant to the "arbitrary and capricious" standard of the Administrative Procedure Act ("APA"). Because DeCA's written D&F determining that the interim contract should continue articulates a rational basis, the Court should not disturb it. This case presents the unique situation where there is no incumbent contractor to provide essential services during the GAO protest period. Accordingly, the agency was compelled to award an interim contract to provide these essential services during the protest period. When that interim contract was in turn protested, DeCA was left with no choice but to override the automatic stay of the interim contract.

This Court should not grant injunctive relief without a consideration of all four injunctive factors. Even if RWPI could demonstrate a likelihood of success on the merits, the balance of harms clearly weighs in favor of the Government, who would no longer be able to provide an essential product to military commissaries in the Northeastern United States. Furthermore, RWPI has failed to demonstrate that it will suffer irreparable harm from FSP's performance of an interim produce supply and delivery contract. Finally, the public interest strongly weighs in favor of the uninterrupted supply of FF&V to military commissaries. Accordingly, RWPI's request for a preliminary injunction should be denied.

**ARGUMENT**

I. Standard Of Review

A. The Substantive "Arbitrary And Capricious" Standard

In a procurement-related challenge, the Court assesses the agency's decision pursuant to the familiar review standard of the APA, 5 U.S.C. § 706(s), as incorporated by the Tucker Act, 28 U.S.C. § 1491(b)(4). RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1291 (Fed. Cir. 1999). Thus, RWPI must "prov[e] that the override decision here was arbitrary and capricious." PGBA, LLC v. United States, 57 Fed. Cl. 655, 660 (2003).

Application of the arbitrary and capricious standard involves neither judicial fact finding, nor review of the agency's factual statements for "substantial evidence." See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing Camp v. Pitts, 411 U.S. 138, 140 (1973)). Rather, the Court will sustain an agency's decision "evincing rational reasoning and consideration of relevant factors." Id. at 1058 (citing Bowman Transp., Inc. v Arkansas-Best Freight Sys., 419 U.S. 281, 285 (1974)). In order to prevail, the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law. Cigna Gov't Servs., LLC v. United States, 70 Fed. Cl. 100, 109-10 (2006) (citing Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003) (additional citations omitted). An agency's decision may be found to be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Keeton Corrections, Inc. v. United States, 59 Fed. Cl. 753, 755 (2004) (citing

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

In evaluating the director's findings, the court "is not empowered to substitute its judgment for that of the agency." Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Consequently, in the context of this action, the Court should simply assess whether the written D&F of DeCA's Director supplies "a rational basis" for the agency's determination to continue interim contract performance. See Chapman Law Firm Co. v. United States, 62 Fed. Cl. 464, 466 (2004) ("Chapman I").

B. The Standard For Preliminary Injunctive Relief

Injunctive relief for a disappointed bidder is an "extraordinary remedy" appropriate "only in extremely limited circumstances." CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000) (quoting CACI, Inc. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). In order to obtain a preliminary injunction, a plaintiff must carry the burden of establishing entitlement to this extraordinary relief by clear and convincing evidence based upon the following factors: (1) a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted; (3) that, if the injunction is not granted, the harm to the plaintiff will outweigh the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. PGBA, 57 Fed. Cl. at 657; Bean Stuyvesant, LLC v. United States, 48 Fed. Cl. 303, 320-21 (2000). But see Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004) (applying a preponderance of the evidence standard). The decision whether to grant an injunction is within the sound discretion of the trial court. FMC Corp., 3 F.3d at 427. Even if a protestor prevails on the merits by demonstrating

that the agency's decision is arbitrary and capricious, the Court need not grant any relief to the plaintiff based upon the remaining three factors for injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1227-32 (Fed. Cir. 2004) (affirming the Court of Federal Claims' decision not to grant any relief to plaintiff, including declaratory relief despite a showing that the agency's decision was arbitrary and capricious).

II. This Court Should Not Award Injunctive Relief Without Consideration Of The Injunctive Factors

In its memorandum in support of its motion for a temporary restraining order, preliminary injunction, and declaratory relief, RWPI suggests that if this Court grants its request for declaratory relief, there is no need to consider the injunctive factors. Pl. Mem. at 25-26.[6] It is true that several recent decisions of this Court have held that it is not necessary to evaluate the injunctive factors after a finding that any agency override determination lacks validity, in order to reinstate the statutory stay of contract performance applicable during a GAO bid protest. See Automation Techs., Inc. v. United States, 2006 WL 2720642, *9 (Fed. Cl. Sept. 11, 2006); Advanced Sys. Dev. v. United States, 72 Fed. Cl. 25, 36-37 (2006); Cigna, 70 Fed. Cl. at 115; Chapman Law Firm Co. v. United States, 65 Fed. Cl. 422, 424 (2005) ("Chapman II"). Cf. Spherix, Inc. v. United States, 62 Fed. Cl. 497, 503 (2004) (finding that declaratory relief with remand has not been shown to be the proper relief in CICA override cases); Keeton Corrections, 59 Fed. Cl. at 754, 759 (granting plaintiff's request for declaratory relief after the Court had previously denied plaintiff's motions for a temporary restraining order and preliminary injunction). In this case, the parties are currently addressing plaintiff's request for a preliminary

[6] "Pl. Mem.__" refers to plaintiff's memorandum in support of its motion for a temporary restraining order, preliminary injunction, and declaratory relief, filed with the Court on September 25, 2006.

injunction and none of these cases suggest that the Court can grant a temporary restraining order or preliminary injunction without a demonstration by the plaintiff that these extraordinary and drastic remedies should be granted based upon an analysis of the four factors.

In addition, while declaratory relief typically does not require an analysis of the four injunctive factors, when declaratory relief would have the same effect as an injunction, the Court should evaluate plaintiff's request for relief as if plaintiff had requested injunctive relief alone. PGBA, LLC v. United States, 389 F.3d 1219, 1227-28 (Fed. Cir. 2004). In PGBA, this Court denied declaratory and injunctive relief to the plaintiff in a bid protest, despite a finding by this Court that the Government's actions were arbitrary and capricious. Id. at 1223. The plaintiff in PGBA requested declaratory relief, however, this Court found that the declaratory relief would be tantamount to an injunction, and therefore, this Court applied the four injunctive factors in determining the appropriateness of both declaratory relief or an injunction. Id. at 1222-23. After evaluating these factors, this Court denied declaratory and injunctive relief. Id. at 1223.

In affirming this Court's decision, the Federal Circuit concluded that when declaratory relief would be tantamount to injunctive relief, the plaintiff's request for relief should be treated as if plaintiff had requested injunctive relief alone. Id. at 1228. Therefore, analysis of the four factors for injunctive relief was appropriate. Id. Likewise, if this Court were to find that RWPI's request for declaratory relief would have the same affect as an injunction, it should not grant RWPI's request for declaratory relief without evaluating the four injunctive factors.

Furthermore, RWPI has requested a temporary restraining order, and a preliminary and permanent injunction prohibiting DeCA from permitting performance of the interim contract until the completion of the protests pending before the GAO. Compl. at pg. 10. This Court has

previously noted that such a request requires the Court to consider the relevant equitable factors.

> It is recognized that there are circumstances where a party might seek to enjoin an agency from exercising its statutory override authority throughout the entire GAO protest period rather than simply contesting the validity of a specific override determination. See Spherix, Inc. v. United States, 62 Fed. Cl. 497 (2004). To enter such an injunction, this court must, of course, consider the relevant equitable factors. Id. PGBA sets forth the proposition that if injunctive relief is truly sought, the court does not "err in looking to the traditional equitable factors in determining whether to set aside award of the contract . . . ." 389 F.3d at 1228.

Chapman II, 65 Fed. Cl. at 424. RWPI's complaint demonstrates that injunctive relief is truly sought. Accordingly, this Court should not award a preliminary injunction without considering the equitable factors.

III. RWPI's Request For Preliminary Injunctive Relief Should Be Denied

CICA, 31 U.S.C. § 3553, grants an agency significant discretion in choosing to override an automatic stay. Pursuant to 31 U.S.C. § 3553(d)(3)(C), an agency may override the automatic stay upon a written finding that:

> performance of the contract is in the best interest of the United States; or
>
> urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C)(i); see also 48 C.F.R. § 33.104(c)(2). In this case, DeCA's Director overrode the stay pursuant to the "urgent and compelling circumstances" provision of the statute. AR 3.

A. The Written Finding of DeCA's Director Is Rational And Lawful And, Therefore, RWPI Has Failed To Demonstrate A Likelihood Of Success On The Merits

In its memorandum supporting its motion for a preliminary injunction, RWPI argues that

DeCA failed to establish that urgent and compelling circumstances required an override of the CICA stay because it only addressed the propriety of the interim contract and did not address the reasons behind the override. Pl. Mem. at 17-18. Contrary to RWPI's arguments, the Director of DeCA's D&F fully addresses the need for the override. See AR 3-5. The override is necessary for the same reasons that the interim contract was necessary.

The D&F explains:

> Produce is a destination category for our patrons, which means that shoppers will come to the store specifically to acquire produce and related items. Doing without this essential category of products is simply not an option. The loss of this product to our stores would negatively impact our patrons if they are unable to obtain this essential category of products, but DeCA as an agency would also suffer because the surcharge generated from those lost sales – estimated at over $3M per month– would not be available to the agency to maintain its infrastructure. Both DeCA as an agency and the patrons would suffer immeasurably if the agency were forced to do without this essential category . . . DeCA has historically secured its FF&V products through the services of the Defense Supply Center– Philadelphia ("DSC-P") . . . [DSC-P] could not commit to providing the level of support required beyond the originally planned September 25, 2006 conversion completion schedule. As such DeCA was faced with two alternatives in order to secure the products it requires: (1) process a written finding by the Head of the Contracting Activity (HCA) to continue performance under the protested contract (CICA override) (FAR 33.104(c)(2)); or (2) not exercise the CICA override provisions, rather, award an interim contract, under FAR 6.302-2, unusual and compelling urgency for the expected period of time that GAO will require to render a decision on the GAO protest (100 calendar days).

AR 3-4. When the interim contract was protested, DeCA was left with only one alternative in order to secure FF&V for its patrons in 41 stores– the CICA override. AR 5, Ex. C ¶ 25. The D&F clearly demonstrates that without an interim contract, DeCA would be faced with an interrupted supply of FF&V or be forced to override the automatic stay because of urgent and

compelling circumstances.

In setting forth "enough facts and circumstances to clearly and convincingly justify the specific determination made," a D&F must include: (a) identification of the agency and of the contracting activity and specific identifications of the document as a D&F; (b) nature and/or description of the action being approved; (c) citation of the appropriate statute and/or regulation upon which the D&F is based; (d) findings that detail the particular circumstances, facts, or reasoning essential to support the determination; (e) a determination, based upon the findings, that the proposed action is justified under the applicable statute or regulation; (f) expiration of the D&F, if required; (g) the signature of the official authorized to sign the D&F. Spherix, 62 Fed. Cl. at 504 (quoting 48 C.F.R. § 1.701). RWPI has not demonstrated that DeCA's D&F, issued on September 20, 2006, fails to meet these requirements. The D&F clearly identifies the agency, the contracting activity, and the document as a determination and findings. AR 3. It clearly states the nature of the action being approved (authorizing contract performance under the interim contract). Id. It cites the appropriate regulation upon which the D&F is based– FAR § 33.104(c)(2). It gives detailed findings describing the unusual circumstances behind the acquisition of FF&V for Area 3, and the compelling need for uninterrupted supply of FF&V for Area 3. AR 3-5. It contains a determination that the proposed action is authorized under the applicable regulation. AR 3. The D&F would presumably expire when the interim contract expires in 120 days. Finally, it is signed by the Director of DeCA who is also the head of contracting activity for the agency. AR 5. Therefore, the D&F follows all the proper procedural requirements, and as will be explained below, it has a rational basis because there is no available alternative for providing FF&V to the commissaries located in Area 3.

1. The Interim Contract Was The Only Reasonable Alternative Vehicle Through Which DeCA Could Provide FF&V To Area 3 Commissaries

First, it must be noted that this Court is not reviewing the legality of the interim contract. The interim contract is the subject of a current GAO bid protest, No. B-298837, and the GAO will decide whether the award of the interim contract was proper. This Court is only reviewing the agency's decision to override the automatic stay that went into effect when the protest of the interim contract was filed. See Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 191 (2005) ("Chapman III")("The government argues, and the court agrees, that whether [the agency] properly awarded the bridge contract in the first instance is not at issue before the court. The legality of the bridge contract goes to the merits of the case, which will be dealt with at the protest before the GAO." ); Automation Techs., 2006 WL 2720642, *4 ("The issue [the protestor] brings before this court is the propriety of the agency's override of the automatic stay resulting from the GAO protest, not the merits of the solicitation process."). Accordingly, the Court's role is to determine if the override was based upon "'a consideration of the relevant factors and whether there has been a clear error in judgment' by the agency." Id. (quoting Advanced Sys. Dev., 72 Fed. Cl. at 30) (internal citation omitted). Therefore, the propriety of the interim contract is not currently before this court.

That being said, the interim contract was the only reasonable alternative to a CICA override permitting performance of the long-term contract because this case presents a very unique situation. In recent years, there have been a number of CICA override decisions from this Court. "As indicated by review of cases decided for and against an override, override cases are fact specific." Automation Techs., 2006 WL 2720642, *8. In almost all cases where the override has been determined to be unreasonable, there has been an incumbent contractor whose

contract could be extended in order to provide essential products and services to the Government while the protest was pending at the GAO. See, e.g., id.; Advanced Sys. Dev., 72 Fed. Cl. at 32; Chapman I, 62 Fed. Cl. at 468; PGBA, 57 Fed. Cl. at 662; Keeton Corrections, 59 Fed. Cl. at 758-59 (agency's use of sole source purchase orders with incumbent was found to be an available alternative). In contrast, in this case, there was no incumbent contractor who could provide FF&V to the 41 commissaries in Area 3. DSC-P notified DeCA of its inability to provide FF&V to Area 3 beyond September 30, 2006. AR 70, 264, Ex. C ¶ 21.

In his declaration attached to this response, Richard Faso, DSC-P's Director of the Customer Operations Directorate in the Subsistence Supply Chain, explains the reasons why DSC-P was unable to provide FF&V support to DeCA beyond September 30, 2006:

> 1. Having serviced DeCA for so long, we are aware of their high expectations for their Produce support, and knowing that we have been losing personnel already, we felt that with a reduced staff (staff at 76, down from 96) and performing functions that they would not typically perform, we could not provide the level of support that DeCA expects, and did not want to damage our reputation as a world class provider by trying to do something without being appropriately resourced.
>
> 2. Our personnel have been advised of the loss of DeCA business since the early stages of FY 06, and they have stayed on to help support the mission. RIF notices were provided to the affected personnel upon the receipt of DeCA's correspondence that indicated they would not need our support in FY 07 for this area. Our personnel, if they did not take the early retirement or separation pay incentive, registered for the Priority Placement Program (PPP), and have begun to receive job offers. Given the turmoil that our personnel have already endured, and out of respect to them, we do not want to give them any false hopes by keeping them on for a relatively short period of time.
>
> 3. At the same time, we did not want our vendors investing funds for a highly perishable commodity, for a brief period of time, and assume the risk of losing money to the loss of product or

unfulfilled commitments.

Ex. A ¶ 8. RWPI contends that DSC-P could support and supply DeCA commissaries with FF&V until all of the new contracts were firmly in place. Pl. Mem. at 19. However, DSC-P did not make that statement to DeCA; and Mr. Faso's declaration demonstrates that DSC-P cannot continue to provide FF&V for Area 3. Ex. A ¶¶ 8-12. Accordingly, there was no incumbent to provide FF&V support to Area 3 after the end of Fiscal Year 2006.

When the first protest was filed on Area 3's long-term contract, DeCA was left with two alternatives– either to override the automatic stay or to issue an interim contract. AR 70. DeCA management determined that the best course of action would be to pursue an interim contract arrangement through the most expeditious means available. Id. This decision was reasonable. RWPI contends that DeCA failed to consider the viable options of using DSC-P's BPAs with vendors, or "issuing purchase orders or executing other contract vehicles, with pre-existing FF&V sources for the protest period so as to preserve the status quo." Pl. Mem. at 19. RWPI further contends that DeCA failed to explain why it could not use, extend, or modify existing BPAs, or create other temporary contract vehicles, or lend employees to DSC-P if DSC-P's acquisition staff could no longer handle the workload. Id. at 20-22.

RWPI fails to demonstrate that its alternatives are viable options. As explained above, DeCA's acquisition of FF&V transitioned to a completely new vehicle for obtaining FF&V for its stores. Throughout 2005, DeCA researched and met with industry representatives to determine the best recommendations for supplying quality FF&V in military commissaries at low prices. Ex. C ¶¶ 4-16. In Fiscal Year 2006, DeCA transitioned its commissaries over to its new acquisition process. It has conducted competitive procurements with different requirements than

were contained in the previously used DSC-P BPAs. Compare Pl. App. Tab 1 with P. App. Tab 8. See Alion Sci. & Tech. Corp. v. United States, 69 Fed. Cl. 14, 29 (2005) (finding that agency's override decision had a rational basis when solicitation demanded "new work" and where no single contract could have been extended to accommodate all of the work that the Government sought under the new solicitation). In this case, DeCA is not just relying upon the fact that the new contracts are better than the old acquisition system, but even more "urgent and compelling" is the fact that the old acquisition system can no longer support DeCA's FF&V needs.

Although not specifically stated in DeCA's D&F, BPAs, as prescribed by FAR § 13.303, were not considered a viable option. Ex. C ¶ 23. BPA's are a simplified acquisition method that are utilized for open market acquisitions of less than the simplified acquisition threshold of $100,000. Id. The estimated value of the FF&V requirements for these 41 stores is estimated at nearly $3,000,000 per month. Id. Even if BPA's could be used for this requirement, they are an administratively burdensome acquisition method. The FAR mandates that the existence of a BPA does not justify purchasing from only one source, or avoiding small business set-asides. FAR § 13.303-5(c). Therefore, the use of BPA's in this instance would actually require that multiple BPA's be established for each store location, thereby allowing the store to compete each individual order amongst BPA holders. Ex. C ¶ 23.

Nor could, as RWPI suggest, DeCA take over or place orders through DSC-P BPAs. The current BPAs in place are between vendors and DSC-P. Pl. App. Tabs 7-8. There is no current process in place for DeCA to routinely place orders directly through and to pay for any orders placed through the DSC-P BPAs. Ex. B ¶ 11. DeCA and the Defense Finance and Accounting

Service ("DFAS") have no established bill paying procedures that would support purchases by DeCA using the DSC-P BPAs. Id. DeCA accounts are paid pursuant to a negotiated agreement between DeCA and DFAS that has established rates based upon known workloads. Id. Assuming that DeCA was even authorized to take over or place orders through DSC-P's BPAs,[7] a takeover would be cumbersome and time-consuming because it would require multiple administrative decisions, actions, employee redeployments, and re-assigments. Id. Furthermore, requiring DeCA to take over or place orders through existing DSC-P BPAs may result in a violation of the Anti-Deficiency Act, 31 U.S.C. § 1341 et seq., if it would require DeCA to authorize an expenditure that has not been appropriated.

RWPI relies heavily upon this Court's decision in Keeton Corrections, for its argument that purchase orders should have been considered and used to meet Area 3's FF&V requirement. However, in Keeton Corrections, the agency used sole source monthly purchase orders with the incumbent contractor, after the incumbent contractor's contract had expired. 59 Fed. Cl. at 755. This Court found that the agency could continue to use the purchase orders through the GAO protest period. Id. at 758. That case is factually distinct from the current matter before this Court because DeCA did not have any existing purchase order with produce vendors, and there was not already a process in place for DeCA to use purchase orders.

RWPI further suggests that DeCA could have detailed or lent certain of its own employees to DSC-P if DSC-P's acquisition staff could no longer handle the workload. Pl. Mem. at 22. RWPI provides absolutely no support for this argument– no evidence that DeCA

---

[7] It is questionable whether DSC-P would even allow DeCA to take over its existing BPAs as they are probably also used to provide produce for DSC-P's other customers, such as military rations, general dining hall food services, institutional food services, aircraft carriers, etcetera. See Ex. A ¶ 3.

has the staff to loan to DSC-P or that DeCA staff have the necessary expertise to select produce for its commissaries. In fact, the workload requirements placed upon members of a commissary's produce department fully occupy their entire work day making it impossible for them to assume any additional workload that had previously been performed by DSC-P staff. Ex. B ¶ 9. RWPI is simply attempting to list every possible alternative to the CICA override, no matter how far-fetched. However, DeCA is not required to discuss every possible alternative, but only must consider reasonable alternatives, especially when faced with urgent and compelling circumstances.

Because of the urgent and compelling circumstances that existed when the first GAO protests were filed, protesting the award of the long-term contract, DeCA could have determined at that time to override the automatic stay. However, DeCA recognized that the CICA override provisions are designed to maintain the status quo by preventing the performance of the challenged contract until the GAO can render a decision on the protest. AR 35. In order to maintain the status quo on the long-term contract, DeCA decided to award a brief interim contract to supply these essential services. This interim contract was long enough (120 days, with two optional 30-day extensions) to give DeCA time to take corrective action should the GAO recommend it. AR 68. Bridge or interim contracts have been upheld or recommended by this Court in the past as a method for providing essential products and/or services. See Chapman III, 67 Fed. Cl. at 192 (finding agency's best interests determination to override the automatic stay of a bridge contract to be well-supported); Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 619 (2005) (noting that Government could continue to procure needed services under a bridge contract during the period of a temporary restraining order).

After DeCA determined that it would award an interim contract, it acted quickly, due to the impending cutoff of DSC-P's FF&V support. Based upon 10 U.S.C. § 2304(c)(2) and FAR § 6.302-2, DeCA made a finding that unusual and compelling urgency necessitated an expedious award of an interim contract without full and open competition. The FAR notes that "this statutory authority requires that agencies shall request offers from as many potential sources as is practicable under the circumstances." FAR § 6.302-2(c)(2) (emphasis added). Having recently completed a competitive acquisition for Area 3, DeCA used the results of that acquisition and asked the two highest-rated firms if they would be interested in a short-term interim contract. AR 70. Both responded affirmatively. Id. If they had not responded affirmatively, DeCA would have had to extend the offer to more firms that had submitted proposals for the long-term contract.

DeCA awarded the interim contract to FSP on September 12, 2006.[8] The interim contract was a reasonable alternative to the CICA override of the long-term contract; however, when the interim contract was protested, DeCA was left with no choice but to override the contract in order to provide FF&V to Area 3 commissaries.[9] Accordingly, DeCA's determination that

---

[8] RWPI questions why the interim contract began on September 12, 2006, when DSC-P "was fully capable of continuing its FF&V coverage for the commissaries at issue until October 1, 2006." Pl. Mem. at 10. With this argument, RWPI assumes that the interim contract requires no preparation time and that FSP could be awarded the contract on October 1, 2006 and begin making deliveries on that date. Although this may be addressed further in intervenor's brief, the interim contract required orders to be placed in advance and deliveries to meet specific requirements. AR 45-47. It is highly unlikely that a contractor could begin performing the interim contract on the day that it was awarded; therefore, the contract would have to be awarded in advance of the initial delivery date.

[9] RWPI suggests that it and several other offerors and contractors were ready, willing and able to supply, under new temporary contract vehicles, the same product and services that were procured from FSP under the interim contract. Pl. Mem. at 21. However, RWPI fails to explain how this would be a better alternative to the override decision. If RWPI were awarded a

urgent and compelling circumstances justified overriding the CICA stay of the interim contract was a reasonable decision with a rational basis, when DeCA had no other viable alternative to supply FF&V to Area 3 commissaries.

2. DeCA's Urgent And Compelling Determination Did Not Arise Because Of A Lack of Advance Planning

RWPI argues that the override determination should be set aside because the Government's lack of advanced planning caused the unusual and compelling urgency. Pl. Mem. at 23-25. RWPI argues that DeCA is placed in this urgent and compelling position because it failed to factor into its transition any time for bid protests. Id. at 24.

While it is true that DSC-P and DeCA agreed upon a fairly aggressive transition schedule, it was not a lack of advance planning that resulted in the unusual and compelling urgency in this case. First, this Court has noted that a compelling circumstance does not arise when some of the problems that arise are of the Government's own making, "resulting from its (apparent) failure to factor into its transition schedule any time for the bid protests that its own risk analysis seemingly identified as probable." PGBA, 57 Fed. Cl. at 663. In this case, there was no risk analysis that identified bid protests as probable. In fact, of the seven awards already made under DeCA's transition plan, five are proceeding without protest. Ex. C ¶ 17. Furthermore, this case presents a unique situation because previously two agencies were working together to provide FF&V to military commissaries. However, when the Department of Defense determined that DeCA would assume total control over its FF&V acquisition requirements, DSC-P acted relatively quickly to reduce its staff and set a firm deadline to terminate FF&V support for various regions. Ex. A ¶ 6.

---

temporary contract, presumably we would be exactly where we are today, just with different protestors, and DeCA would have faced the same override decision.

It is doubtful that DeCA would have the authority to request DSC-P staff stay on beyond these RIF deadlines. Therefore, it would have been difficult for DeCA to build in bid protest time to its FF&V contract awards.

RWPI also challenges the "unusual and compelling urgency" determination for the interim contract based upon DeCA's alleged lack of advance planning. Pl. Mem. at 24-25. As noted above, this Court is not addressing the merits of the interim contract award, only the propriety of DeCA's override decision. Nevertheless, RWPI's argument is without merit. RWPI relies upon this Court's decision in Filtration Development Co. v. United States, 60 Fed. Cl. 371 (2004); however, that decision supports DeCA's actions in this case. In that decision, the Court noted that "'the agency [must] take reasonable steps to accurately determine its needs and describe them.'" 60 Fed. Cl. at 381 (quoting Filtration Dev. Co., LLC v. United States, 59 Fed. Cl. 658, 663-64 (2004) (internal citation omitted). The Court further noted that urgency justification cannot support more than the minimum quantity needed to satisfy the immediate urgent requirement, and the invocation of the exception should not continue for more than a minimum time. Id. (citing Filtration Dev. Co., 59 Fed. Cl. at 663-64; Matter of: Tri-Ex Tower Corp., B-239628, 90-2 CPD ¶ 221, at 5 (Comp. Gen. Sept. 17, 1990)). Here, DeCA has accurately determined and described its needs. AR 69-72. The interim contract is just for the amount of time necessary to permit the GAO to make a decision on the protest of the long-term contract, and to give the agency opportunity to take corrective action, if necessary. Furthermore, the interim contract is a requirements contract, so the interim contractor will only provide the necessary amount of FF&V to the commissaries in Area 3. AR 69.

For all of the above reasons, RWPI has not demonstrated that DeCA's override decision

lacked a rational basis, or was arbitrary, capricious, or contrary to law. Therefore, RWPI has failed to demonstrate a likelihood of success on the merits. Its motion for a preliminary injunction should, therefore, be denied.

B. The Balance Of Harms Compels The Denial Of RWPI's Motion

Even if RWPI were to establish a likelihood of success on the merits of this action, the balance of harms warrants a denial of preliminary injunctive relief. Indeed, no irreparable harm to RWPI would flow from a denial of injunctive relief, whereas the harm to the United States and third parties for an injunction would be substantial and immediate. The Court should, therefore, deny RWPI's request for a preliminary injunction. PGBA, 57 Fed. Cl. at 657; Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 109 (2003) (listing equitable factors and noting "[c]ourts interfere with the government's procurement process only in extremely limited circumstances").

1. No Irreparable Harm To RWPI Would Result From Denying Injunctive Relief

RWPI fails to establish that it would suffer any irreparable injury from a denial of preliminary injunctive relief. RWPI argues that it will suffer irreparable injury because FSP will gain an understanding of the requirements of the FF&V long-term contract by performing work under the interim contract. Pl. Mem. at 30. RWPI further agues that if FSP is allowed to perform work under the interim contract, it will provide an unfair competitive advantage, and DeCA's D&F improperly failed to consider the unfair competitive advantage of awarding the interim contract to FSP. Pl. Suppl. Mem. at 2-3.[10] RWPI also contends that loss of the interim

[10] "Pl. Suppl. Mem. __" refers to plaintiff's supplement to its memorandum in support of motion for a temporary restraining order, preliminary injunction and declaratory relief, filed on September 27, 2006.

contract results in a loss of profits, damage to its marketplace reputation and future business opportunities, and a significant and immediate threat to the stability of its workforce. Pl. Mem. at 31-32.

In Spherix, this Court also considered a plaintiff's claims that the loss of contracts would result in economic harm to its business, including the necessity of dismissing many of its employees. Spherix, 62 Fed. Cl. at 506. This Court noted that "economic loss without more does not rise to the level of irreparable injury." Id. (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)). The Court further noted that "most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract." Id. (citing Sierra Military Health Servs. v. United States, 58 Fed. Cl. 573, 582 (2003)). Likewise, RWPI's alleged harms are not the result of the loss of the opportunity to compete for the interim contract of only 120 days but of DSC-P's loss of DeCA as a client. Presumably, RWPI's BPAs with DSC-P are not as valuable as they were when DeCA was a DSC-P client. However, RWPI was aware that DeCA was transitioning to a new system for the supply of its FF&V, and in fact submitted a proposal for the long-term contract. AR 249.

Furthermore, RWPI has not even demonstrated that it had a reasonable chance of being awarded the interim contract, even if DeCA had considered all the offers received for the long-term contract. [***************************]. AR 249. DeCA would have had to complete an entirely new competitive acquisition in order for RWPI to even be considered for the interim contract. As explained above, urgent and compelling circumstances did not permit DeCA to complete an entirely new competitive acquisition.

Although it is true that a competitive disadvantage may result in irreparable harm, PGBA,

57 Fed. Cl. at 664, RWPI has not provided sufficient evidence that FSP will gain a real competitive advantage by performing the interim contract. See Chapman III, 67 Fed. Cl. at 193 ("no irreparable harm to plaintiff where bridge contract is awarded to provide for a transition period between contractors"). While DeCA is now conducting its own competitive acquisitions for its FF&V requirements, instead of relying upon DSC-P support, it is well established that DeCA's operation "mirrors" the commercial supermarket. Ex. B ¶ 2, 10 U.S.C. § 2484(a). DeCA is not contracting for a defense weapons system, it is contracting for the supply and delivery of fresh produce. Provided that RWPI also provides this service to commercial grocery stores, it should have no problem providing the same service to military commissaries. In other words, FSP is not gaining any inside or specialized knowledge by performing the interim contract.

2. Because An Injunction Would Leave DeCA With No Means To Supply FF&V To Military Commissaries In The Northeastern United States, The Harm To The United States And Third Parties Far Outweighs Any Harm To RWPI

As noted above, produce is an essential food category for military commissaries. As DeCA's D&F noted, "[d]oing without this essential category of products is simply not an option." AR 3. DeCA would suffer because of an extreme loss of surchage sales– estimated at over $3,000,000 per month– but more importantly, military service members and their families would receive less compensation for their service to our country. Id., Ex. B ¶¶ 12-13. They would be forced to go and buy their produce at commercial supermarkets where they would have to pay normal commercial prices.

Even RWPI does not suggest that DeCA should stop supplying FF&V to Area 3 commissaries. Its memorandum merely states that there would be no harm to the United States if

FSP stopped performing the contract "and another contractor/offeror was permitted to immediately supply the required goods and services under, for example, pre-existing contract vehicles." Pl. Mem. at 33. However, as discussed above, RWPI has failed to demonstrate the existence of a viable pre-existing contract vehicle through which DeCA could obtain FF&V. It is now past October 1, 2006, which was the final date that DSC-P could provide FF&V support to DeCA. AR 264, Ex. A ¶¶ 7-8. Furthermore, FSP has already begun performance on the interim contract. FSP has already made deliveries and placed orders for produce. "There are sure to be heavy administrative burdens associated with enjoining the present [interim] contract." Chapman III, 67 Fed. Cl. at 194. Even a transition to another contract vehicle at this point would result in an interruption of FF&V support for an indefinite amount of time. An injunction of the interim contract would deprive military families of valuable compensation in the form of monetary savings on produce purchases, deprive DeCA of money that is used to maintain its infrastructure, and result in harm to FSP.

Because of the significant harm that would result to the United States and third parties from an injunction, this factor strongly supports denying RWPI's motion.

C. Denying Injunctive Relief Is In The Public Interest

For many of the same reasons, the public interest favors denying injunctive relief. As noted above, produce is a destination category in military commissaries, meaning that patrons will come to the commissaries specifically to purchase produce. Ex. B ¶ 3. Furthermore, FF&V has become even more important to shoppers in recent years with the emphasis on healthy lifestyles and physical fitness. Id. This is evident by the fact that in August 2006, commissary produce sales increased 11.5 percent and for the first time produce sales exceeded those of fresh

meat. Id.

Again, RWPI only suggests that public interest will be served by a preliminary injunction if there are alternative contracting means to procure the services obtained under the interim contract. See Pl. Mem. at 33-34. RWPI does not suggest that DeCA and military service members and their families should do without this essential product in military commissaries. However, as addressed above, there is no incumbent contractor and no alternative contracting means to provide FF&V to military commissaries in Area 3. Therefore, an injunction would result in commissaries in Area 3 operating without an available supply of quality FF&V, which would in turn deprive military service members and their families of a valuable part of their compensation for their service to our country. Clearly, the public interest strongly weighs against the award of injunctive relief.

## CONCLUSION

For these reasons, we respectfully request that the Court deny RWPI's request for preliminary injunctive relief.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

OF COUNSEL:

THOMAS D. RATHGEB
Deputy General Counsel – Litigation
Defense Commissary Agency
1300 E Avenue
Fort Lee, VA 23801-1800

s/Dawn S. Conrad
DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 305-7643

Dated: October 3, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 3rd day of October, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION" and "EXHIBITS" were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Dawn S. Conrad

**Agreed-Upon Redacted Copy– May Be Made Public**

**INDEX TO EXHIBITS**

Page

Exhibit A
Declaration of Richard Faso . . . . . . . . . . 1

Exhibit B
Declaration of Thomas E. Milks . . . . . . . . . . 11

Exhibit C
Declaration of Lawrence P. Hahn . . . . . . . . . . 15