**Exhibit B**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| **REILLY'S WHOLESALE PRODUCE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-668C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| | ) | |
| **FOUR SEASONS PRODUCE, INC.,** | ) | |
| | ) | |
| **Intervenor.** | ) | |
| | ) | |

**DECLARATION OF THOMAS E. MILKS**

1. I am a civil service employee of the United States, and am currently employed by the Defense Commissary Agency (DeCA) as a commissary management specialist, GS-1144-15, and am specifically assigned to the position of Director of Sales for the Agency.

2. The Defense Commissary Agency operates the United States military's grocery stores worldwide. It was created on October 1, 1991, as a new Defense Agency by merging the existing commissary systems of the Army, Air Force, Navy and Marine Corps into one entity. While DeCA's operation "mirrors" the commercial supermarket, its mission is to administer the commissary benefit which provides savings by selling food and household items at cost, plus a surcharge, to members of the military, their families, retirees, and reservists, as part of the compensation package for the sacrifices they make in the defense of the United States. The savings provided to members of the military by the commissary is an important element of the military compensation package. In Fiscal Year 2005, DeCA was able to save military members, on average, 32% on their grocery bill over what they would have paid at a commercial supermarket; or, stated another way, using the Department of Agriculture economic analysis, this savings provides an annual savings of almost $2,900.00 for an average family of four. The five percent surcharge added to a patron's purchase is used to pay for the construction of new stores, and the repair, renovation and maintenance of existing stores.

3. Fresh Fruit &Vegetables ("FF&V") is a destination category in commercial supermarkets as well as military commissaries, meaning that patrons of supermarkets will come to a store specifically to purchase their produce and not merely pick up those items as an afterthought. Consequently the primary concern of customers in regard to FF&V is the quality of the produce they purchase. In addition, FF&V has become more important

to shoppers in recent years as a result of increased emphasis on healthy lifestyles. The quality of FF&V sold in military commissaries has always been of particular importance and concern because of the emphasis on physical fitness required of military members. When coupled with significant price reductions (as compared to that available in commercial grocery stores) providing quality FF&V in military commissaries has grown in importance with the military's greater emphasis on health, making its availability an absolute requirement. This is demonstrated by the fact that in August 2006, commissary produce sales increased 11.5 percent and for the first time produce sales exceeded those of fresh meat.

4. Prior to the activation of DeCA and during its early transition, the primary supplier of commissary retail merchandise to commissaries was the Defense Supply Center – Philadelphia ("DSC-P"). DeCA assumed the responsibility for buying brand name commercial items such as canned vegetables, canned fruit, and laundry soap from DSC-P in 1994, purchasing these items directly from manufacturers. Later that same year DeCA also assumed the responsibility from DSC-P for buying fresh meat for resale. At the conclusion of the produce contracting program, DeCA will have assumed responsibility for procuring all resale items sold in its commissaries. DSC-P, is a sub-agency of the Defense Logistics Agency, an agency of the Department of Defense.

5. Because of its patrons' demand for high quality, low price produce, DeCA has always been a demanding customer for DSC-P. The FF&V procured for military commissaries for resale is not the same as the produce required by institutional buyers such as dining facilities, prisons, etc. For example, in preparing for a six month deployment of an aircraft carrier, the Department of the Navy will order bananas for the crew. However, because those bananas will not be eaten at or near the time they are delivered to the ship, the requirement is for green bananas, which will ripen over time. In contrast, when the spouse of a military member seeks to purchase bananas in his or her grocery store, including a military commissary, he or she is looking for ripe bananas that will be eaten in a relatively short period of time. Consequently, the FF&V acquired by DeCA from DSC-P did not always meet the requirements of its patrons. In addition, because DSC-P's business model had a multitude of organizational layers between the FF&V in the field and its final use in a military commissary patron's kitchen, each layer added costs and handling charges to the end product. Thus, DeCA patrons were not able to enjoy the same degree of savings for FF&V as they did for other commissary items procured through direct competition, negotiation and contracting. DeCA patrons expect a good variety of high quality produce at lower prices in their commissaries as compared to the quality and price of FF&V in commercial grocery stores.

6. Consequently, DeCA began to develop plans that would allow it to obtain better quality FF&V at lower price by using business models other than that used by DSC-P; that is, to acquire FF&V directly from producers and vendors, rather than through the middleman of DSC-P. Seeking a "best business model" approach, DeCA initiated a contract in early 2005 to test industry capabilities to support DeCA's FF&V requirements. The contract with a small business concern in Tidewater, Virginia, adopted commercial grocery practices to serve twenty (20) of DeCA's stores. The results

of the DeCA Produce Test were impressive: providing cheaper produce; increasing patron savings by 17 percent; increasing the tonnage sold by over 25 percent; reducing order lead-time to one day from the previous average of two days; simplifying and streamlining the ordering process through the contractor's web-based ordering system; and improving labor efficiency because the industry provided support system was more reliable. Because of the success of this test, DeCA, with the agreement and participation of DSC-P, elected to proceed with the transformation of FF&V procurement for DeCA patrons, resulting in the awarding of several contracts throughout the continental United States according to that model, including the contract at issue in this proceeding, for Area 3.

7. DeCA's leadership recognized that as this new business model was deployed, there could be no disruption in the supply of FF&V to military commissaries. It is essential to DeCA patrons that quality produce at a reasonable price be available in military commissaries throughout the transition to the new business model.

8. Under the DSC-P business model, the supporting Defense Subsistence Office (DSO) had total responsibility for finding sources of supply, inspecting for quality and wholesomeness, procuring the product, and consolidating the product from numerous sources and securing the delivery of the total produce order that met the DeCA requirement for each commissary they serviced. DSC-P's produce buying staff had developed years of experience and knowledge and the required business relationships necessary to execute their business model. DeCA was not a party to the system employed by DSC-P and did not assist in the procurement and delivery of the product to the commissary. DeCA simply placed orders with the DSO. DeCA employees never had the opportunity to develop the experience, knowledge, and business relationships needed if DeCA were simply to assume the DSC-P purchase agreements.

9. DSC-P's decision to reorganize its FF&V procurement processes which resulted in the retirement, resignation, and/or reassignment of the DSO personnel who formerly supported DeCA's requirements, made it impossible for DeCA to obtain its required FF&V support from DSC-P, as indicated in conversations between Larry Hahn and Pat Scott of DSCP on September 7, 2006. Further, the workload requirements placed on the members of the commissary's produce department fully occupy their entire work day making it impossible for them to assume any additional workload that had previously been performed by the DSC-P staff.

10. DSC-P purchased produce through blanket purchase agreements ("BPA") that each vendor supplying produce executed with DSC-P.

11. There is no current process in place for DeCA to place orders directly through and to pay for any orders placed through the DSC-P BPAs. DeCA and the Defense Finance & Accounting Service ("DFAS") have no established bill paying procedures that would support purchases by DeCA using the DSC-P BPAs. DeCA accounts are paid pursuant to a negotiated agreement between DeCA and DFAS that has established rates based on known workloads. Assuming DeCA was authorized to take over the BPAs

from DSC-P, a takeover would still require multiple administrative decisions, actions, employee re-deployments and re-assignments. It would be a cumbersome and time-consuming process that would adversely affect the government, suppliers (who could refuse to do business with the government if they were not paid in a timely manner) and military families (who would be deprived of quality produce at a lower price).

12. Relying on BPAs would require DeCA patrons to accept FF&V which was of an institutional character (i.e. the green bananas for the aircraft carrier) rather than of a resale quality. Ultimately, if military families are forced to pay more for their groceries at commercial supermarkets than they would at military commissaries, they receive less compensation for their service to our country because they are no longer able to obtain groceries at a discounted price.

13. In my opinion, it would be totally unacceptable for the commissary to continue to operate without an available supply of quality FF&V. Likewise, suggesting military families pay more for their groceries at commercial supermarkets than they would at military commissaries, diminishes the value of the compensation that the commissary benefit represents.

I declare under penalty of perjury that the foregoing is true and correct.

Thomas E Milks
Thomas E. Milks

Date: 2 Oct 06