**Exhibit C**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | | |
|---|---|---|
| **REILLY'S WHOLESALE PRODUCE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-668C** |
| | ) | **(Judge Allegra)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| | ) | |
| **FOUR SEASONS PRODUCE, INC.,** | ) | |
| | ) | |
| **Intervenor.** | ) | |
| | ) | |

**DECLARATION OF LAWRENCE P. HAHN**

1. I am a civil service employee of the United States, and am currently employed by the Defense Commissary Agency (DeCA) as a supervisory procurement analyst, GS-1102-14, and am specifically assigned to the position of Chief, Resale Contracting Division. I have served in that position since March 1, 2001. Prior to my current position, I have served in a variety of DeCA acquisition positions since September 22, 1991.

2. On September 24, 2004, I was a participant in a meeting that was convened at Fort Lee, Virginia, which involved leadership from both the Defense Supply Center – Philadelphia (DSC-P) and DeCA. The purpose of the meeting was for DSC-P to advise DeCA about on-going initiatives within DSC-P regarding present and future fresh fruits and vegetables (FF&V) support for DeCA. DSC-P advised that their current organizational structure for acquiring FF&V consisted of a network of approximately 160 field personnel spread out through various offices throughout the United States. Among the other topics briefed regarding current initiatives, they also briefed that DSC-P had recently contracted for an independent consultant study to obtain recommendations on how best to "right-size" the DSC-P organization. DSC-P further acknowledged that this study included two future scenarios: (1) DSC-P continuing to provide FF&V support for all of its current customers (including DeCA); and (2) DSC-P providing FF&V support for all of its current customers – without DeCA. This was the first indication to DeCA from DSC-P about the possibility that FF&V support to DeCA would be discontinued at some future date.

3. Thus, DeCA recognized they needed to be prepared in the event that DSC-P would no longer be available as the executive contracting activity for our store needs. On October 1, 2004, I attended a meeting with DeCA senior management where the principle

topic of discussion was the potential loss of FF&V support from DSC-P at some future date. The concern was that DeCA had no first-hand experience with acquiring FF&V, and that it was important that the agency take whatever measures were possible to educate itself on the operational and acquisition rules, regulations, and nuances of acquiring commercial FF&V. As the senior acquisition person for resale, I was asked to participate in several subsequent meetings with other agency operational personnel to discuss possible alternatives for acquiring FF&V for our stores – both within the continental United States (CONUS) as well as worldwide.

4. Over the next week, several planning meetings were convened where the participants were tasked with identifying the current practices and trends of commercial grocery markets, and to try to determine what best practices could be adopted by DeCA. Rather than "reinvent the wheel," our goal was to mirror those best practices. What we learned was that there were a variety of practices being employed, but that, similar to DeCA's experience, FF&V was considered by commercial grocers to be a destination category. However, it was also recognized that FF&V being acquired for the military commissaries by DSC-P had not always been of the same quality as that found in commercial supermarkets and grocery stores, and did not seem to afford the military commissary patron the same level of savings over commercial supermarkets and groceries that other categories in commissaries provided. This was of concern to the DeCA leadership who believed that the quality and price of FF&V sold in commissaries should be the best that the agency can offer.

5. As a result of this planning process, DeCA elected to conduct a test of what we determined to be some of the best commercial practices. The principle objectives were to utilize commercial practices, through a streamlined process of automation and minimal human-intervention, to provide quality FF&V at reduced costs, both in administrative costs and reduced overall costs to the patrons. On December 16, 2004, DeCA awarded a formal contract to the firm of Norfolk Banana Distributors (NBD) to provide FF&V support on a test basis to a total of twenty (20) DeCA store locations in Georgia, North Carolina, South Carolina, Virginia, and West Virginia. The primary purpose of this contract was to test the actual capabilities of industry to use commercial methods to provide FF&V support to military commissaries. The term of that agreement covered the period of mid-January 2005 through mid-September 2005 (8-months).

6. Concurrent with the on-going test contract initiative, DeCA also sought to invite other members of the FF&V industry to provide DeCA with information about their own practices, to include recommendations about how DeCA should consider conducting its FF&V program in the future. On January 25, 2005, DeCA convened a conference at Fort Lee, VA, at which time it solicited input from industry representatives concerning possible commercial solutions to the world-wide DeCA FF&V requirements. Approximately 40 people from industry and government activities, including DSC-P, attended this meeting. The DSC-P representative made a general statement about the on-going reorganization study at DSC-P. Subsequently, by scheduled appointment, DeCA met separately with representatives of the individual firms that had requested an audience so that they could address their issues in a more private setting. As a result, DeCA

believed that the commercial produce industry in the United States could provide the product and level of services for its long-term needs for FF&V.

7. On April 12, 2005, I met with the DeCA produce specialists: Carroll Allred, Shirley Disch, Donna Baird, and David Kryniski. Each was provided with a copy of a draft statement of work (SoW) for FF&V that I had drafted, and I asked them to provide their comments and recommendations to me so that I could develop a SoW that would represent the various requirements of the agency subject matter experts

8. In early April of 2005, DeCA obtained the preliminary results on the effectiveness of the commercial practices being employed under the test contract with NBD. According to those figures, DeCA was realizing the following results (when compared to "control stores" that had been identified in advance by the agency): store ordering lead-time was significantly reduced, produce quality had increased, merchandising support had increased, customer satisfaction had increased, patron savings had increased, and total sales (tonnage and dollars) had increased. On April 20, 2005, based on these results, DeCA e-mailed DSC-P to advise them of the interim results, and to advise they that DeCA expected any DSC-P initiatives for FF&V in the future to mirror these successes.

9. Given the continued success of the DeCA test contract with NBD, in early May 2005, DeCA decided that to return the stores to the pre-test method of FF&V support (through DSC-P) would be a disservice to its patrons who had become accustomed to the benefits of the test arrangements. On May 11, 2005 DSC-P was advised of DeCA's plans to permanently assume contract support for the 20 stores covered by the test contract with NBD, as well as two additional OCONUS store locations (Keflavik, Iceland & Guantanamo Bay, Cuba), that were being serviced by the Tidewater Defense Subsistence Office (DSO) at that time.

10. On June 2, 2005, DeCA issued solicitation HDEC02-05-R-0007 to competitively acquire FF&V support for these 22 store locations. The closing date for receipt of proposals was June 28, 2005. On June 28, 2005, DeCA received multiple proposals in response to this solicitation. Technical evaluations and negotiations with the offerors, in accordance with the requirements of the solicitation and the Federal Acquisition Regulation (FAR), ensued over the next 2-month period. On September 22, 2005, DeCA awarded a competitive contract (HDEC02-05-D-0013) to the firm of Military Produce Group (MPG) to provide FF&V support to the 22 store locations specified under the earlier solicitation document. Performance commenced on October 1, 2005. The base term of performance was two years, with the possibility of two additional one-year options. The estimated value of this contract is $145,000,000 for the four-year period.

11. On July 14, 2005, members of the DeCA planning team visited the Washington D.C. office of the U.S. Department of Agriculture, Perishable Agricultural Commodity Act (PACA) Branch. The principle purpose of the meeting was to discuss the PACA license process as well as current trends within the commercial produce

industry. The PACA representatives advised that in the past, the terminal markets generally contained the higher quality products. However, the current market trends were that commercial grocers now get the first choice of the products, and that whatever they reject is what goes to the terminal markets. The terminal markets were where DSC-P acquired some of the produce for our stores.

12. On August 18, 2005, I attended an industry roundtable in Philadelphia, PA that was publicly announced and hosted by DSC-P. The session was attended by over 100 members of industry. During this session, DSC-P announced their long-term plans for FF&V acquisition to industry, to include a conversion from the current DSO field buying process of blanket purchase agreements (BPA) to a more centrally managed process of formal contracts. Over the next 2-week period, DSC-P conducted two additional similar public events, one in Denver, Colorado and one in San Francisco, California.

13. On September 20, 2005, the Department of Defense (DoD) notified DeCA that DeCA would assume total control of its FF&V acquisition requirements. On November 2, 2005, DeCA attended a meeting at DSC-P to discuss a joint transition plan. At this meeting, DSC-P representatives from CONUS, Europe, and the Far East offered information about their current operations, and DeCA shared information about its on-going plans to assume direct contract support. The agreed upon target date by which to have completed the transition from DSC-P support to DeCA support was September 30, 2006.

14. Given that, DeCA began an aggressive transition schedule that would allow for DeCA assumption of coverage before the September 30, 2006 deadline. DeCA leadership recognized that it was important for DeCA to secure input from industry representatives that had traditionally supported DeCA through a third-party provider (DSC-P). Given the extremely positive results of the test contract, management sought to secure the best possible results from the new worldwide initiative. On October 19, 2005, DeCA issued Notice to Trade 06-14, announcing its intention to host an Industry Roundtable on DeCA Produce Options in Atlanta, Georgia. Within that same notice, DeCA announced its plans to discuss the implementation of a DeCA FF&V program that would meet DeCA's goals of providing the best quality products at the best possible prices to DeCA facilities worldwide. Industry representatives were invited to submit any questions, suggestions, recommendations, and concerns relating to the implementation of this program. The meeting was scheduled for November 16, 2005.

15. On November 16, 2005, DeCA hosted the Industry Roundtable at the Airport Marriott in Atlanta, Georgia. It was attended by approximately 170 members of industry. Roundtable participants were directed to the DeCA website (www.commissaries.com) and advised that both the most recent solicitation (HDEC02-05-R-0007) and the contract (HDEC02-05-D-0013) issued by DeCA for its FF&V requirements in the mid-Atlantic States were posted at that location. We further invited all attendees to download the documents, review the contents and provide any recommendations or comments about our SoW, proposed program, etc. to DeCA for

consideration as we finalized our plans for advertising for those locations still supported by DSC-P.

16. During the week of December 5 – 9, 2005, I met with the DeCA Chief of Perishables Division several times to go over the responses and recommendations that had been submitted by industry as a result of the Atlanta Industry Roundtable. DeCA received responses from a total of 27 firms. As a result of this input, we were able to adopt and incorporate the best recommendations into our final SoW requirement, as well as define the groupings of store locations into clusters that would facilitate the stated objectives. Based on the industry input, DeCA segregated the CONUS into six (6) geographical groups, which we referred to as "Areas". On December 28, 2005, DeCA issued Notice to Trade 06-37 announcing the official agency plan for transitioning from DSC-P support to DeCA contracted support and publishing the geographical groupings.

17. As DeCA awarded its contracts, I coordinated specific transfer dates with Ms. Pat Scott at DSC-P, who would in turn communicate that information to her DSO field personnel. She further indicated that DSC-P would utilize this shared information in their internal planning process for reducing the field buying operations. Under this FF&V transition program to date, DeCA has issued a total of five solicitations, and awarded a total of seven formal contracts. Of those seven awards, five are proceeding without protest.

18. The solicitation for Area 3, No. HDEC02-06-R-0005 was issued on March 20, 2006, after having been synopsized in www.fedbizopps.gov on March 14, 2006. DeCA awarded one formal contract on August 22, 2006 for the store locations in Area 3. Contract No. HDEC02-06-D-0013 was awarded to the firm of Four Seasons Produce, Ephrata, Pennsylvania for 41 store locations. Performance under the contract was to commence on September 18, 2006. On August 23, 2006, I communicated via e-mail with Ms. Scott that we had awarded the contract. I advised her that given the large number of stores and advance training that was being scheduled, I would need to follow-up with her for the actual conversion dates.

19. On September 2, 2006, DeCA received notification that a GAO protest (B-298751) had been filed against the award of contract HDEC02-06-D-0013 to Four Seasons Produce by Philadelphia Produce Market Wholesalers (Philadelphia). Subsequently, DeCA received notification of additional protests having been filed against the same contract: (1) an agency-level protest filed by Reilly's Wholesale Produce, Inc. (Reilly's); (2) an agency-level protest filed by Sbrocco International, Inc. (Sbrocco); and (3) a GAO protest (B-298751-2) filed by Reilly's. On September 5, 2006, the Contracting Officer (Ms. Sheila Norfus) notified the awardee (Four Seasons) both verbally in writing that a protest had been filed, and that performance was to be stayed under the subject contract. DeCA also notified the Small Business Administration (SBA) that a size status challenge had been submitted and provided the requisite documents to the SBA for a final size determination.

20. On September 5, 2006, I communicated via e-mail with Pat Scott at DSC-P, and advised her of our situation regarding the existence of protests, and the fact that we had to stay performance under the formal contract for Area 3. I asked her whether DSC-P had the capability to continue contracted coverage for our stores in this area. Through the various coordination efforts between the agencies, DeCA was already aware that concurrent with DeCA's plans for transitioning to direct DeCA support, DSC-P had also implemented their long-term strategy for continuing FF&V support to their other non-DeCA customers (e.g., Troop Support, schools, prisons, etc.). That plan involved a significant downsizing of the field buying operation (162 FTE's or full time equivalent employees) that DSC-P has previously utilized to support all of its FF&V customers. DeCA was also aware that on July 24, 2006, DSC-P issued solicitation # SPM300-06-R-0008 to solicit proposals for a "full line fresh fruit and vegetable support for DoD and non-DoD activities located throughout the United States." According to the solicitation, DSC-P segregated the United States into three geographical sections, and required that proposals be submitted on a staggered schedule of August 24, September 21, and October 12. It was obvious from the progress of their actions to date that DSC-P was in the process of reviewing proposals that had already been submitted. The solicitation further states that their timetable was to convert to 100% prime vendor contracts on a phased-in basis between January and April of 2007. Ms. Scott had previously shared with me that DSC-P had initiated the requisite personnel actions to remove their field buying personnel from its rolls through announced reduction-in-force (RIF) notices. These actions have been, and are continuing to be, accomplished CONUS-wide in concert with DeCA's progress to assume its own direct-contract conversions, and as DSC-P gets closer to implementing its own new prime vendor agreements.

21. On September 7, 2006, I followed up my September 5, 2006 e-mail and spoke with Pat Scott concerning DSC-P's capability to continue contracted coverage for our store locations in area 3. She conveyed that, after considering the status of their agency's transition to their new operational business model, and considering the number of their field buying personnel that are already listed on Priority Placement listings, and considering the number of complaints that they are currently receiving each day expressing concerns about the drop-off in the level of services DeCA is receiving, DSC-P did not feel that they can adequately support our requirements beyond October 1, 2006. They wished us well with the outcome of our protests, but could not commit to support beyond that to which they have already agreed.

22. Facing a stay of performance under the original contract award, coupled with the loss of the DSC-P support by which DeCA had previously been acquiring its FF&V for these 41 store locations, DeCA was faced with the dilemma of determining how best to continue to secure these products for our store locations. DeCA considered the possibility of processing a written finding by the Head of the Contracting Activity (HCA) to continue performance under the protested contract (Competition in Contracting Act ("CICA") override) (FAR 33.104(c)(2). However, a decision to override the automatic CICA stay provisions is a very serious matter and requires a determination that it is necessary (urgent and compelling circumstances) and required because the interests of the United States, and not just the agency involved, will be significantly affected. While

DeCA has a continuing need for produce during the time the protest is before the GAO, the Agency did not believe that it could justify exercising the override provision because it had the capability to issue a short term contract for the interim period while GAO considered the matter.

23. Therefore, DeCA considered other alternatives as interim solutions. Blanket Purchase Agreements (BPA's), as prescribed by FAR 13.303, were not considered a viable option. BPA's are a simplified acquisition method that are utilized for open market acquisitions of less than the simplified acquisition threshold of $100,000.00. The estimated value of the FF&V requirements for these 41 stores is estimated at nearly $3,000,000 per month. Even if BPA's could be considered for this requirement, they are an administratively burdensome acquisition method. With the manpower available in DeCA stores, use of BPA's to order produce would be particularly onerous because of the competition required before placing each order. The FAR mandates that the existence of a BPA does not justify purchasing from only one source, or avoiding small business set-asides. BPA's simply do not lend themselves to the competition requirements of CICA for acquisitions of this magnitude. When using simplified acquisition procedures, the FAR states that maximum practicable competition ordinarily can be obtained by soliciting quotations or offers from at least three sources to promote competition to the maximum extent practicable. The use of BPA's in this instance would actually require that <u>multiple</u> BPA's be established for each store location, thereby allowing the store to compete each individual call amongst the BPA holders. The DeCA store level personnel are not qualified to make acquisition decisions on any basis other than "low price." As such, no consideration would be given to quality when placing these orders. Simple logic dictates that it serves no purpose to receive a great price on a piece of fruit that cannot be sold. A rotten banana at 5 cents is not a better deal than a quality piece of fruit at a higher price.

24. The remaining option for DeCA to consider was the use of an interim or bridge contract. This would allow for the continued flow of product to the stores during the period of time that the GAO would require to fully adjudicate the protest, but would not entail performance under the long-term original contract award, thereby preserving the intent of the GAO mandate to stay performance. Unfortunately, buying produce is not analogous to buying a fixed piece of standard equipment. As a destination category for grocery shoppers, the <u>quality</u> of the produce is a key factor to its salability at store level. As such, quality and price must be taken into consideration together (best value) in order to ensure an end product that is of any use, to the store or the patron. Given the extreme limited time period available to establish this interim contract, DeCA considered the following alternatives: (1) issue a solicitation to secure proposals from any interested parties to provide FF&V for the interim period; or (2) utilize the information derived from the recently completed acquisition process to identify qualified firms to which to consider for award of an interim agreement. As evidenced by the numerous solicitations completed to date, the time necessary to properly solicit, evaluate, and award formal contracts of this magnitude (2-3 months) greatly exceeded the time available to DeCA to secure these services. As such, the Contracting Officer elected to utilize the procedures authorized by FAR 6.302-2 -- Unusual and Compelling Urgency, which permits the

agency to contract via this method when the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for. This statutory authority requires that agencies shall request offers from as many potential sources *as is practicable under the circumstances*. Given the situation described herein, the agency contacted the two firms that had been determined the best value (considering technical capability, past performance, and price) to the government – thereby ensuring that we would not be acquiring produce on a "low bidder" basis, which would be a disaster. Each firm was asked if they would be interested in a short-term, interim contract, and each acknowledged that they would be interested, under the same terms as were represented in their most recent proposal. Given these circumstances, DeCA accomplished the necessary justification and approval document (FAR 6.304) and awarded contract HDEC02-06-D-0017 to Four Seasons Produce on September 12, 2006 for the interim period of 120 calendar days.

25. On September 19, 2006, DeCA became aware that Reilly's had filed a GAO protest (B-298837) against the award of the interim contract. Recognizing that the immediate CICA stay provisions were applicable, the agency senior management was briefed. At this point, the options for securing FF&V for our patrons was down to one single alternative, that being a written determination by the HCA, in accordance with FAR 33.104(c)(2), to authorize contract performance under the interim contract (HDEC02-06-D-0017) by Four Seasons Produce. The determination was executed by the HCA, Mr. Patrick B. Nixon, while he was on official travel in the Far East on September 20, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Lawrence P. Hahn

Date: October 2, 2006